Mr. Justice HUNT,
 

 having stated the general nature of the case, delivered the opinion of the court.
 

 I. The first’ three assignments of error are based.-‘upon a •single idea, to wit, that there was error in decreeing that Brown & Co. could discharge themselves from theiiiobligation to return the bonds loaned to them by paying their market value; that the same error existed in.regar^ io the bonds overpaid them on the bond' contracts, and alsp.au relation to the bonds paid to them on the cash contracts,.
 

 As to each class it is insisted that the bonds ip Specie should have been returned or their nominal fapfeTvalue allowed to the city. , The'loan was of 240 bonds of $1000 each.
 
 At
 
 the time of making thé loan there was due to. Brown .& Co. on the paving contracts several hundred thousand dollars.- This indebtedness the city did not wish to pay, or was linable to pay. To meet the emergency the’city loaned its bonds to "Brown & Co., to be return „d in eighteen months with interest...
 

 The argument is that by their contract Brown & Co.
 
 *304
 
 agreed to return the bonds to the city, and that a specific performance of this agreement is necessary to do justice to the city.
 

 Conceding the power of the court to compel the specific performance of a contract relating to personal property, this does.not appear to be a ease justifying its exercise. Specific performance is never decreed where the party can be otherwise fully compensated.
 
 *
 

 If Brown & Co. have received bonds of the city, which they are bound to return, and do not return, what damage does the city suffer? The face of the bonds and interest, it is said, as if they run to maturity, the city will then be liable, for the. payment of the whole amount. Not so. We are not to inquire what may be the damage' to the city eighteen years heuce, but what it suffers at the present time by the default of Brown & Co. If Brown & Co. should now be. decreed to pay the face of the bonds, instead of an indemnity, the city would make an actual profit. Suppose' the amount of bonds in. question to be $200,000. With the sum of $100,000 the city could now purchase the whole amount of .bonds supposed to be in issue, and retain as a premium or .profit the remaining $100,000. In his brief the appellant’s counsel says that it is not niaterial that the very bonds loaned shall be returned, so that an equal'amount, with corresponding coupons, are returned. That this equal amount may now be purchased by the city at fifty cents on the dollar-would seem to be conclusive, that when Brown & Co. are charged with the bonds at.fifty cents on the dollar, and the. city is credited with that sum, that the damage of the city for the item in question is properly assessed.
 

 But it is said that the city has not the money at command to buy these bonds; that it cannot thus indemnify itself, and, therefore, its loss is' the face of the bonds. This considera-. tion can have -no legitimate influence. A rule of law is based upon principle, upon sound considerations of justice and' public policy, and usually as manifested by the precedents
 
 *305
 
 and authorities. It is the same for all classes and conditions. None are so high as to .be above its claims, none so low as to be beneath its protection. ' It will be a sad era in the history of any country when the application of a rule of law shall depend upon the wealth or the poverty of a party to a suit; upon his wealth; which would thus enable him to’ increase that wealth, or his poverty; which would be thereby aggravated.
 

 No court and no government can protect against the misfortunes of poverty. The unfortunate mortgagor who sees his farm sold by his rigid creditor for half its value, for the want of money to redeem it,.receives our sympathy, but the rules of law cannot be altered or suspended to aid him.1 So, in the case before us, the law is the same, whether the city of Memphis is in funds or whether it has no funds. The value of its bonds in the market is fifty cents on the dollar. With that amount of money it can now place in its treasury the bonds which Brown & Co. fail to return. It is difficult to see that the damage sustained can he beyond that amount.
 

 Whether the city .had the legal right to loan its Donds does not seem to be a practical-question. It did loan them, and the contractors received them. If not a loan, the transaction was a gift, which will not be pretended,; or it was a loan of so much money as was realized by their sale. The defence of usury is not set up in the pleadings, or. apparently claimed on the trial, and it cannot now be urged. We . assume the issue of the bonds to have béeii a legal transaction, and think the rule of damages for their uou-retürn ivas properly fixed by the master.
 

 In
 
 Dana
 
 v.
 
 Fiedler,
 

 *
 

 the court say: “ Complete indemnity requires that the vendee shall receive that sum which, with the price he had agreed to pay, would enable him to buy the-article which the vendor had. failed to deliver.”
 

 In
 
 Griffith
 
 v. Burden,
 
 †
 
 being a suit, for the conversion of a State bond, the court say;- “ Another rule, equally well
 
 *306
 
 grounded and more frequently applied, is that the damages ought to be such as will compensate the party for his loss. In this case the plaintiff has lost his bond. Another like bond of precisely equal value to, the plaintiff can be purchased in the market for the amount of the verdict in this case, .the market value. . Hence the verdict compensates him for his loss, and is the precise measure of damages.”
 

 [This resolution, and the contract of November 20th reciting it, are set forth, supra, p. 295. — Rep.]
 

 These are the general rules upon the subject, and that they control thé question in the case before us, sufficiently appears from numerous authorities.
 
 *
 

 . II. It is insisted, secondly, by the appellants that Brown & Co. cannot maintain a^ suit, on the paving contracts, for the reason that by the resolution and contract of November 20th, 1868, Brown & Co. released the city from all liabilities upon the paving contract, uuless it should be decided by the courts of last resort that the property-holders are not liable to pay for the same.
 

 In deciding upon the effect of this contract the situation and condition of the parties are to be considered. Brown & Co., the contractors, had embarked in' an enterprise involving the expenditure of nearly a million of dollars. The propertv-owners refused to pay the assessments made upon them. The city was not able or was not willing to meet its gua- inty of payment, and was indebted to the contractors' in the amount of'several hundred thousand dollars. The contractors must have relief or go to the‘wall, as their predecessors had done. They applied to the city for that relief, and instead of making payments, the city'-undertook to .make á loan of its bonds. ' .It imposed harsh and severe con-, ditions which, nothing except.-the financial desperation of the contractors'could justify them in accepting. Their claim against the city for the amount of work done was'valid,'and
 
 *307
 
 the amount was then payable. There was no good reason why they should delay a-call for its present payment, especially none for its delay until the last possible chance of litigation in the State courts was exhausted. There .was no good reason why the large sum due from the city should be thus indefinitely suspended in consideration of a loan of bonds to the nominal amount of $175,000, but which were worth some $80,000 only, about one-fourth of the amount actually owing to the contractors.
 

 It is not necessary to decide whether this presented a case of moral duress, which in equity avoids the contract, or whether a contract can, under any circuriistanees, be so avoided. It is sufficient to say that it is a hard and oppressive contract, that if the pound of flesh is exacted the party must take care that he violates no law of the State in obtaining it. Before the court will sanction the exaction of conditions so harsh and oppressive it will be careful to know that every stipulation on the part of the creditor has been fully performed..
 

 As the consideration for the release, the city undertook and promised to deliver to the contractors one hundred and seventy-five one-thousand dollar pavement bonds, and to deliver the same as rapidly as the same could be executed by the officers of the city.
 

 How the city performed this agreement is stated by Jhe master in his report.
 
 *
 

 In the performance of this contract, to which assent was given by Brown & Co. to obtain immediate relief, we find, first, that there was great delay' in delivering $140,000'of the bonds. Belay, we may well assume, was a serious injury to the contractors. Their necessities brooked no delay. Belay was nearly as bad as a refusal.
 

 We find, secondly, that $35,000 of the bonds rvere never delivered.
 

 We find, thirdly, that this non-delivery was wilful on the part of the city authorities; and-fourthly, that they applied
 
 *308
 
 in payment of tbe other debts of the city the bonds thus pledged and appropriated'to Brown & Co.
 

 After taking advantage of their necessities to make a bard and oppressive bargain with those whose necessities placed them at the mercy of any one having money, or the moans of raising money, they wilfully and deliberately refuse to perform their part of the agreement. It is difficult to un'derstand how parties standing before a court of equity can ask for the enforcement of a contract thus violated by themselves.
 

 The letter of credit was a shift to avoid a direct refusal to deliver the bonds as agreed. As stated by the master, these letters have no single element of a commercial acceptance. They are equal!}' destitute of every quality by which money could bo raised upou their credit. The city had already violated its agreement by delay in issuing the $140,000 of bonds. It was violated again in the delivery of these letters instead of the bonds themselves. What- security had any capitalist that further shifts and contrivances would not be resorted to to avoid the delivery of the bonds? None whatever; and it could not be otherwise than, its the fact proved, that they would be unavailing to Brown
 
 &'
 
 Co. for the purposes required by them.
 

 The agreement of November 20th was, in substance, an executory agreement for an accord and satisfaction. The release was to operate when the city actually loaned the bonds, not when it agreed to loan them. It is set up in the pleadings as au accord and satisfaction, and full performance is averred. The consideration for the release was wholly executory, and it was never performed; but the release was dependent entirely on such performance. '¡The language of the release is this: “And upon the further consideration that the said contractors wilt-release the city upon all liabilities upon said paving contract, unless it shall be decided,” &c-. There is no present release, but an agreement to release based upon the performance of the considerations specified. The performance failing, the agreement to release goes with it. . It is a case not where the válue of the bonds
 
 *309
 
 is sought, to be recovered, but where a forfeiture is sought to be enforced. In 1 Smith’s Leading Cases it is said :
 
 *
 
 “ The accord must be executed, and a mere executory agreement can nevter be pleaded as an accord and satisfaction.” Again: “If.part of the consideration agreed on be not paid the’ whole accord fails.”
 

 Many other considerations might be added to show the invalidity of the claim we are considering. A single'oue only will be mentioned. It is shown that the court of last resoft of the State of Tennessee has recently decided that the property-holders are nob liable to pay for.this pavement.
 
 †
 
 The appellate court in equity, would scarcely overrule a decision of the court.below made under such circhmstanees, were it Conceded that the law was prematurely held by that court to be as iris now found by the court of last resort in that State, and although- the suit was commenced prior to such actual adjudication.
 

 We hold that this objection is not well taken.
 

 III.’ It is alleged also that there was- error in decreeing the city to be liable for the payment of the cash contracts, by reason of their guaranty or for any other reason.
 

 The general incorpóration act of the State '6f Tennessee gives to cities of the State full power to provide for the paving of streets, alleys, and sidewalks.
 

 The charter of this city declares that “ the board of mayor and aldermen shall have power to improve, preserve, and keep in good repair the streets, sidewalks, public landings, and squares of the city.”
 

 It provides also, that the city may require lot-owners to improve the streets fronting their lots, and that
 
 “
 
 should any owner fail to comply with any ordinance requiring him to repair, grade, and pave the same, the mayor and board of aldermen may contract with some suitable person for repairing, grading, and paving the same, and pay therefor,” and collect the amount of- the lot-owue.r.
 

 
 *310
 
 By the contract in question, the contractors agreed to do the paving specified, and the city agreed “to pay or cause to be paid to the'parties of the second part” the price specified “upon the following terms of paymeut, to wit: Upon the completion of each section, the contractor shall receive from the owner of lots fronting on said section one-half of the price of the same in cash, the remaining half to be paid by the owners in thirty, sixty, and ninety days, they giving their notes for the same, with the lien fixed by the charter retained in the notes. The city of Memphis will and does hereby guarantee to the contractors the payment of said accounts as so assessed agginst the property-owner.”
 

 It is said that about half of these assessments have been paid by the property-owners, that the residue of the lot-owners have refused to pay. The statutes referred to give the city ample power to undertake the work of paving, and to contract to pay for the sanie.
 
 *
 

 The charter also gives the city power to issue bonds of the city to be used for paving the principal streets of the city.
 
 †
 
 Under this authority the city passed an ordinance providing for the issue of city bonds to the amount of $900,000 for the purpose of paving the streets and alleys of the city.
 
 ‡
 

 These references show full authority in the city to make contracts for paving, to be paid for in cash, as was done in the.first contract; or in the bonds of the city, as was done in the case of the second contract.
 

 General power and authority over the subject is by law given to the city, and the power also vested in the city to require that the cost may be assessed, upon the adjoining owner, does not impair the power of the city itself to do the work.
 
 §
 
 It is permissive merely. The city may require the owner to pay, but it is-not compelled to do so.
 

 In the contracts we are nowT considering, the following provision was contained: “ The city of Memphis will and does hereby guarantee to the contractors the payment of said accounts as so assessed against the property-owner or
 
 *311
 
 owners for the pavement according to the] plans and specifications.” It will be perceived that this is a guarantee of. payment, and not of collection merely, and upon which, upon general principles of law, a suit may be commenced against .the grantor without any previous suit against the principal.
 
 *
 

 The thirty, sixty, and ninety days'had long-passed, and the payments had not been made by the owners. These periods, we think, furnish the limit of delay, that Could have been contemplated-, before the city became liable to pay., Numerous authorities are cited in the brief of counsel and-in the-learned'opinion of the circuit judge, to s-lmw that, upon a contract thus worded, the city is liable in -a suit brought by the contractor. They fully sustain the position. .The fact, however, that the Supreme Court.of Tennessee has .now decided that an assessment upon the property-owner fon this expense is void, as in violation of the .constitution of the State, would seem to render much, discussion unnecessary. The work .was done under a contract with and by the employment of the city; the claim of the coil tractor, is upon his contract, to which the -city aloné' is the counter party. A particular mode in which payment was expected to bé obtained, fails. The city cannot allége the illegality of th’e:.proposed detail of payment as-a defence to itself. - If it “caused” the owners to pay, that was well. If it failed jn that, as it has, both in fact and in law, its guarantee of payment remains in forcé.
 
 †
 

 IV. It is further alleged that there was-error in holding the city liable for the paving under the bond contracts, as after the modifications agreed upon, the contracts, it is said-, contained no agreement by the city to pay or to guarantee.-
 

 In- thé bond contract, dated July 16th, 1867, the under
 
 *312
 
 taking of the city was direct to niake payment to the contractors for the work done, in the bonds of the city. Thére was no provision for'assessment, no reference to property-owners, and no guarantee of payment. This agreement was subsequently modified as to the amount to be paid for certain' portions of the work and as to the form of payment, with a provision for assessment and collection of certain portions thereof, as had been made in the cash contracts, and' which contracts were declared to. be binding on the parties respectively.
 

 The principles laid down in considering the last preceding objection control this one also. The contract was made with the city, and it cannot evade its payment, whether contracted to be paid for directly or through other persons, or by an illegal assessment. The latter contract contains no abandonment or waiver .of the original agreement of the city to pay for the work. Such waiver cannot be presumed or implied.
 

 Y. By the report of the master there was found to be due to Brown & Co., from the city, and which went to make up the balance, the following item, viz.: “3d. To damage suffered by failure of the city to guarantee and provide lor the payment of paving bonds as stipulated, $115,216.”
 

 In the judgment of the court, réudered in November, 1872, this item was reduced from the sum of $115,216 to $89,808, and as thus modified the item forms a portion of the judgment in the case. The allowance of this item is the fifth ground of error alleged by the appellant.
 

 By the contract termed the bond contract the contractors undertook to do the work mentioned at prices specified. The city undertook to pay for the same “in Memphis City paving bonds, payable in'five, ten, and fifteen years, in' equal proportions, with six per cent, coupons attached, payable semi-annualty,- principal and interest guaranteed and pro-, vided for by a sinking fund set aside for that purpose. Bonds to be taken, at par ”
 

 ' Several questions arise upon this objection which it is not necessary to discuss. Thus it is argued that this breach
 
 *313
 
 of the contract had occurred before the assignment of the contracts to Brown & Co., that the assignment was taken and assented to by the city, upon the request of Brown & Co., without suggestion of claim for compensation on that account, and that they are estopped now to make such claim again. It is insisted that the duty of providing a fund for redeeming the bonds was a ministerial duty, which could be enforced by mandamus, and for which no other remedy exists, and that this remedy still remains.
 

 We pass by the consideration of these points, and place our objection to the allowance of the item in question upon the ground, first, that the damages allowed are not in their nature capable of legal computation, that there is no legal standard by which they can be fixed, that they are shadowy, uncertain, and speculative.
 

 The claim is based upon the theory that if the city had provided a sinking fund, which it did not do, Brown & Co. could have sold the bonds which were delivered to them for a greater price than they were, in fact, able to obtain for them.
 

 The evidence on the subject was from four bankers or stockdealers in Memphis. The evidence of the first one examined, Mr. Elder, is as follows:
 

 “ Q. State, if you know, what establishes the market value in Memphis of bonds and stocks, or how the market value in this city is affected by the New York market.
 

 “A. They are governed by the New York market.
 

 “ Q. State what has been the cash market value of Memphis City thirty-yéar six per cent, bonds, in New York and-. this city, from 1st day of Jauuary, 1868, to 1st January, 1871.
 

 “A. The range here has been from forty-six to fifty-two cents on the dollar. Personally, I know nothing of the New York price, but the price here would be regulated by the price there. The value of the bonds has been depressed by the failure to pay the interest.
 

 “ Q. 'State, if you know,, the market value, in this city and in New York, from 1st January, 1868, to 1st.January, 1871, of Memphis City short bonds, running five, ten, and
 
 *314
 
 fifteen years in equal proportions, with six per cent, coupons attached, payable semi-annually, principal and interest guaranteed and provided for by a sinking fund set aside for that purpose.
 

 “A. My opinion is that if the sinking fund had been actually provided, and placed in the hands of a trustee, such bonds would have been .worth from eighty-five to ninety cents on the dollar.
 

 “ Q. State whether or not the city of Memphis ever placed any money in your hands, as trustee, for the payment of either principal or interest on t,he paving bonds alluded to in the last question and answer; if yea, when, and how much, and whether you so applied it.
 

 “A. The city never placed any money in my'hands for any such phrpose.”
 

 The testimony of Mr. Murphy, a banker, was as follows:
 

 “ Q. What, in your judgment, would have been the market value of the bonds described in the. last question and answer during the period and at the places referred to, had the city guaranteed and provided for the payment of the bonds, principal and interest, by a,sinking fund set aside for that purpose ?
 

 “A. Had such fund
 
 been actually collected and placed in the hands of trustees of known integrity,
 
 and that fact generally known by the community here and in the Eastern cities, in my opinion such bonds would be readily sold from eighty to ninety cents on the dollar.”
 

 The evidence of the other bankers did not differ materially from that of Elder and Murphy.
 

 In the report of the master, the damages allowed were based upon the conclusion that the bonds would have been worth eighty-five cents on the dollar if the sinking fund had beeu provided, and the difference between this value and the market value of the,bonds as they were, made up the sum of $115,216. • The circuit judge fíxéd the value-of the bonds upon the same evidence at seventy-eight cents on the dollar, and reduced the item- by some $25,000.
 

 It will >be seen upon this statement of the facts that the
 
 *315
 
 bankers allowed themselves a range of ten per cent., in the value of the bonds to be guaranteed by the city; and that the master and the circuit .judge differed to the extent of seven per cent, in estimating their value. These differences and the reasons given furnish a strong illustration of the shadowy and unsubstantial character of the claim.
 

 The master reaches his conclusion by finding for what sum the contractors, were willing to do the work in cash, for what sum they would do the same work for guaranteed bonds, and from these facts be reaches a conclusion of the cash value of the bonds as estimated by the parties. He argues further that if not actually worth eighty-five cents, they might have been so placed by the contractors as to be worth that rate to them.
 

 The learned judge, on the other hand, repudiates these views, and says-that the question is not what the parties estimated the bonds to be worth, as they might have been and most likely were mistaken in their estimate of value, but that the sole question is the market value.
 

 The answer to the argument of the master appears to be a good one, but we think the argument of the judge is no sounder.
 

 How can there be a correct market value of that which never existed? A. contracts to deliver to B., on the first day of October, one thousand bushels of merchantable winter wheat. He delivers the quantity of wheat, but it is spring wheat, is dirty, musty, and unsound. The damages, the difference or value, between the article agreed to be delivered and that actually delivered, are readily ascertained. The unsound wheat is there, and the sound, merchantable wheat is there. But it would be very difficult to estimate these damages if sound wheat had never been bought or sold; if, in fact, it had never existed. It would have been equally difficult if the value of standard wheat should be claimed to be more valuable when held by one man than when held by another. By this is meant to indicate the uncertainty and unknown character of what is termed a sinking fund set apart for that purpose by the city of Memphis.
 
 *316
 
 Tins uncertainty is well illustrated by the evidence of the witnesses before quoted. Mr. Elder says that if “the sinking fund had been actually provided and placed in the hands of a trustee, such bonds would have been worth from eight}?five to ninety cents on the dollar.” But the city did not undertake to raise the sinking fund in advance, nor at any time to place it in the hands of a trustee, beyond their own control. It would have been as easy to have paid the cash as to have done this.
 

 Mr. Murphy'says: “ Had such fund been actually collected and placed in the hands of trustees of knpwn integrity, and that fact generally known by the community here and in the Eastern cities, in my opinion the bonds would be readily sold from eighty to ninety cents on the dollar.” The wit-, nesses make the value of the sinking fund depend- upon these conditions: 1st. It should be actually collected in advance. 2d. It should be placed in the hands of .trustees. 3d. These trustees should be persons of known integrity., These conditions the city never undertook to perform. It was not expected by either party that the money should be raised in advance, or that it should be beyond the control of the city when or so far as raised. When the city made a pretence or an attempt at raising such a fund it was only by directing that a certain portion of its income should be placed in the hands of its own officers as trustees, and,- of course, subjedt to its own control. When paving bonds to the amount of $900,000 were authorized by law, and were executed, the city’ officers used them at pleasure for the ordinary-purposes of the city, regardless of the special purpose for which they were created. What security had any persoiCthat they would not do the same with any sinking fund in their possession? No time was specified within which the fund should be raised or commenced; no rate or proportion for any year or years was fixed upon. It was wholly indefinite and uncertain.
 

 The witnesses were quite right in their statement of what constituted a-valuable sinking fund.
 

 The market value of a bond' security depends chiefly upon
 
 *317
 
 the confidence or want of confidence in its ultimate payment. Its immediate convertibility enters largely, into the question. United States six per cent, bonds sell at this time at about twenty per cent, above par. Immediately previous to the late civil war, and during the early part of the contest, they sold at prices ruinously low. The existence of the government and the payment- of its bonds were then doubtful. The solvency and the good faith of the government are now undoubted, and its bonds are convertible into money as readily as one species of money may be converted into another. Seven per cent, bonds of the State of New York sell at about seven per cent, above par. Missouri sixes sell at about ninety-five per cent., or five per cent, below par. Of the corporate bonds of railroads secured by mortgage, those of the Chicago, Burlington, and Quincy road (eight per cents) are quoted at one hundred and ten, the Michigan Southern and Northern Indiana (seven per cent.) at one hundred and five, Cleveland and Toledo (seven per cent.) at one hundred and three. The accumulation of interest may make slight difference in some instances, as exemption from, taxation may enhance the price of United States securities. These references are made-to show how variable and beyond any principle of calculation is the market price of securities, each as good as securities can well be. The genuine recognized bond of. the State of New York affords as complete security for the return of the principal and the regular payment of the interest as does a United States bond, but although bearing one per cent, greater interest, its selling price is thirteen per cent, less than that of a United States bond. Liability to taxation can explain but a small portion of this difference. Corporate bonds as perfect in their character as such securities can be, show a like variation.. Memphis City bonds of the ordinary character sold at about fifty cents on the dollar at the time the present bonds were issued. No man can undertake to say that this price would be essentially increased or how much by a sinking fund like that we have discussed.
 

 The value of a Memphis City bond, guaranteed by a sink
 
 *318
 
 ing fund of the city,-depended first upon a confidence or want of confidence in the resources of the city. If it was ab-. solutely unable to pay its debts a promissory sinking fund would not raise its credit to any perceptible extent. The value depended next upon'the public estimate of the honesty and good faith of those having the city affairs in charge. If they were tricky, dishonest, and unprincipled persons, who would not scruple to misapply or pervert a sinking fund, their bonds would be of little value. A dishonest person is an unsafe debtor. There is no satisfactory evidence of the resources of the city, and certainly no satisfactory evidence that a sinking fund would be of any practical value to the bondholders. The city was liable for the face of the bonds in any event, and that was all there was of the obligation.
 

 "We are of the opinion, upon this view of the contract before us, that there was no legal standard by which the damages claimed could be measured, and no legal evidence that such damages existed. The principles and ideas upon which the alleged damages are claimed cannot be reduced to a money standard. They do not form the subject of legal calculation in dollars and cents.
 

 2d. We think that Brown & Co. are not now at liberty to claim damages for the non-existence of the si irking fund.
 

 They were quite aware of the provision in the contract for the sinking fund. They knew that this provision had not been made; they received the bonds as a performance, without-objection or protest, and made no demand that this provision should be complied with. They have never offered to return the bonds; they are now outstanding, a valid claim against the city to their face. This was a waiver.
 
 *
 

 3d. They negotiated the bonds. They negotiated the coupons. These securities are still outstanding against the city. Whatever claim there may be for a sinking fund, or for damages for the want of it, would seem to belong to the holders of the bonds, and not to the party to whom issued. The right to a fund for redemption of a bond, to enforce it
 
 *319
 
 by mandamus, or to ask damages for its violation, is an incident of the bond, attached to and inseparable from -it.
 
 *
 
 There cannot be a cause of action in one to recover the whole face of the bond and interest, and in another to. recover damages for the want of a collateral security to the bond,. The allowance of damages now to Brown-& Co. will be no defence to a claim for the whole face of the bond, to be made by .the holder of it. The city would thus be liable to pay the face and interest of the bond to the holder after having paid twenty-eight per cent, to Brown & Co. for the absence of a guaranty of the payment of the same bond. This cannot be sound law.
 

 VI. In the accounts allowed by the master, and sustained by the Court, were the following items, viz.:
 

 “ 4th. To cash, paid as'the reasonable value of -the services of attorneys employed to prosecute special assessments, by request of the city, $10,000.
 

 “ 5th. To the value of services in the collection of special assessments or paving bills, without process of law, by'request of the city, $25,000.”
 

 The allowance of these items constitutes the sixth allegation of error. The items are closely akin, and may be considered together.
 

 The ordinances of the city of.Memphis required that the city attorney should prosecute all suits .to which the city might be a party or in which it might be interested.
 

 By the terms of the cash paving contracts it was provided that the accounts for the paving should be made out by the city engineer, and delivered to the contractors for collection, and if .not paid within ten days after the payment became due “ said accounts, or so much as shall be due and unpaid, shall be placed in the hands of the city attorney for colléction under the city charter.”
 

 The duty of the parties under this stipulation is plain. The contractors are to collect the accounts, so far as they are able to- do so, within ten days after the payment becomes
 
 *320
 
 due. They can demand no compensation for. this diity, however onerous or expensive it may be. It is a duty imposed upon them by the-express terms of the contract. After the lapse of ten days the burden is shifted, and the duty fails upon the city, to proceed through the agency of their attorney to collect the accounts. The contractors have nothing to do with this further proceeding. They are not bound to employ other attorneys, nor are they at liberty to do so and charge the expense to the City. Taking the contract as a guide, the matter seems too plain for argument.
 

 But it is said that these services were rendered by the contractors at the request of the city* and that the employment of the additional attorneys was also at the request of the city. We think this is not an answer to the objection.
 

 1st. This paving contract was entered into under a special and restricted authority, and in a mode specifically pointed .out by the local law. The mayor was authorized to advertise for twenty days for proposals for doing the work according to the plans and specifications. Tire mayor and finance committee were, therefore, authorized “to make and enter into a contract with the lowest responsible bidder as to pay•ments, timé of completion, and under such restrictions as they.may think best.” The city engineer was then directed to make a plat of the work to be done, to lay before the board an estimate of the entire cost of the improvement under the contract, marking upon each lot the amount for which it should be liable, and which amount'was declared to be a debt due from the owner, and to be a lieu upon the lot.
 

 This authority was pursued in making the contract. Bids were sought by advertisement. Bids were made by different parties. The bid of Taylor, McBean & Co. was accepted, as the most favorable to the city. The formal contract was entered into under these stipulations. We think this contract cannot be itiodified, as if it were an ordinary contract, made under the ordiuary municipal authority. If the common council can vary it by assuming duties and waiving obligations therein imposed upon the contractors, in respect
 
 *321
 
 to the collection of .the bills and the employment of attorneys, they may do it by increasing the .price to be paid for the-work. Instead of favoring the contractors to .the extent of $35,000, as is proposed in the present instance, they may give them unlimited'favors. .This idea is in hostility to the entire scheme of advertising for bids, contracting with the lowest bidder, fixing the amount of the debt and lien of each,lot-owner. We think the contract as made must be abided by. It must be performed according to its. terms.
 

 2dly. The case fails to show any variation of the contract by authority ,of the citjn . No act of the common council appears giving sanction to the changes alleged to have been made. “ The mayor and the city attorney,” one of the attorneys employed testifies, " were apprised of the extraordinary-efforts we were making to effect collections without suit, and approved the same and urged ns .to make all possible. efforts. My recollection is that the city attorney advised the same course.” The-city engineer, Mr. Ballard and Mr. Brown,, all testify on this subject. In no instance is there any other evidence of authority than that the mayor and city attorney urged them to make great efforts in the collections, and advised them to retain counsel in-looking up titles -and to aid in bringing suits. It is not suggested even that the finance committee, which was the agent of the .city in making the contract, advised or assented to any change in its terms. We think that a contract entered into with the solemnities observed in the present instance cannot be modified upon the evidence of authority here referred to. There is no evidence that the city ever assented to the change.
 
 *
 

 VII. It is also alleged as error that before the cause was .ready for. a decree, and without settling tlier rights of the' parties, the court referred it to a master for an account, and the master took and stated the account under his own view of the law and the facts,-and virtually decided the case instead óf the court.
 

 
 *322
 
 In November, 1870, Messrs. Brown & Co. moved for an order of reference upon the notice already set-out [see supra, p. 297].
 

 No exception was - taken to the order of reference. No exception was taken before -the master. All the evidence was,presented that was desired by either party. Full justice in this respect was attained, and we are of the opinion that ■this allegation of error is not well grounded.
 
 *
 

 The result of, our bpinion is that, the judgment is correct, except as to the items hereinbefore discussed — of $89,608 damages for the want of a sinking fund, of $10,000 for. the services of.attorneys, and $25,000 for the plaintiff’s services in collecting the bills for paviisg. As to these there was error.
 

 .Decree reversed, and the'case remitted.to the Circuit Court with directions to enter a decree ir
 

 Accordance with these views.
 

 Justices FIELD and BRADLEY concurred in the judgment of reversal, but dissented from the opinion, they hold-, ing that the contractors ought to be charged with the full ■amount of bonds received by them, inasmuch as the eity of Memphis had no authority to sell its bonds for less' than théir par yalue.
 

 *
 

 Story’s Equity,
 
 §§
 
 714 to 730.
 

 *
 

 2 Kernan, 48.
 

 †
 

 35 Iowa, 138.
 

 *
 

 Griffith v. Burden, 35 Iowa, 138; Wheeler v. Newbould, 5 Duer, 37; Brown v. Ward, 3 Id. 660; Brightman v. Reeves, Executor, 21 Texas, 70; Tracy v. Talmage, 14 New York, 162-191.
 

 *
 

 Seventh American edition, 604 (*445); 605 (*445) American note, whejfe numerous cases are cited in support of the principles laid down.
 

 †
 

 See Taylor
 
 v.
 
 Hart.
 

 *
 

 Bridge’s Digest, 132.
 

 †
 

 Ib. 192, 233.
 

 ‡
 

 Ib.
 
 §
 
 110.
 

 §
 

 Ib. 140.
 

 *
 

 Railroad Company
 
 v.
 
 Howard, 7 Wallace, 407; Zabriskie
 
 v.
 
 Railroad; Company, 23 Howard, 381; Leggett
 
 v.
 
 Raymond, 6 Hill, 641.
 

 †
 

 Kearney
 
 v.
 
 City of Covington, 1 Metcalfe (Ky ), 339; Baldwin of City of Oswego, 2 Keyes, 141; Sleeper
 
 v.
 
 Bullen, 6 Kansas, 30; City of Louisville
 
 v.
 
 Hyatt, 5 B. Monroe, 199; Cumming
 
 v.
 
 Mayor of Brooklyn, 11 Paige, 596; Manice
 
 v.
 
 City of New York, 8 New York, 130.
 

 *
 

 Reed
 
 v.
 
 Randall, 29 New York, 358.
 

 *
 

 Tracy v. Talmage, 14 New York, 162; Oneida Bank v. Ontario Bank, 21 Ib. 490.
 

 *
 

 Carroll
 
 v.
 
 St. Louis, 12 Missouri, 444; Butler
 
 v.
 
 Charlestown, 7 Gray, 12; Clough
 
 v.
 
 Hart, 11 American Law Register (N. S.), 95; Halstead
 
 v.
 
 Mayor of New York; 3 Comstock, 430.
 

 *
 

 Field
 
 v.
 
 Holland, 6 Cranch, 25; Story
 
 v.
 
 Livingston, 13 Peters, 359; 2 Smith’s Chancery Practice, 372; Troy Iron and Nail Factory
 
 v.
 
 Corning, 6 Blatchford, 328.