## LAND OBEROESTERREICH v. GUDE et al.*
### No. 40.

Circuit Court of Appeals, Second Circuit.

Nov. 30, 1936.

Wachtell, Manheim & Grouf, of New York City (Samuel R. Wachtell, Harold Manheim, and Meyer Grouf, all of New York City, of counsel), for plaintiff-appellee-appellant.

A. Spotswood Campbell, of New York City (Karl T. Frederick and A. Spotswood Campbell, both of New York City, of counsel), for defendants-appellants-appellees.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The plaintiff, a political subdivision of Austria, brought this action to recover damages for conversion of certain bonds which it had issued. The original action was in replevin, but after plaintiff discovered that all but 3 of the bonds had been sold by defendants, a supplemental complaint was filed claiming damages for conversion, and the case was tried upon the issues raised by the supplemental complaint and answer. The defendants are a firm of New York stockbrokers who took over from Blyth &

Co., another brokerage house, the account of a customer named Alma & Co., of New York City and Vienna, Austria. On February 28, 1930, when the defendants took the account, they paid to Blyth & Co. $212,051.06, which was the amount that Alma & Co. owed Blyth & Co., and received from the latter collateral which Alma & Co. had deposited to secure the account, consisting, among other securities, of $125,000 par 6½ per cent. bonds and $55,000 par 7 per cent. bonds of the plaintiff, the Province of Upper Austria. After the opening of the account with the defendants, the latter made various purchases and sales of securities for Alma & Co. over a period of a number of months and collected the coupons and dividends of such securities in regular course. Plaintiff claims that the securities held by the defendants were its property that had been improperly pledged by Alma & Co., but it is conceded that the defendants were pledgees for value and without notice of the securities held by them for account of Alma & Co. All but 3 of the bonds were sold by the defendants in ways which plaintiff says involved a conversion of its property that had been improperly pledged by Alma & Co.

At the close of the evidence, counsel for each party stated that no questions of fact were in issue and each side moved for the direction of a verdict. The judge thereupon directed a verdict in favor of the plaintiff for the sum of $76,837.50, as well as for the return of 3 bonds which remained unsold. The plaintiff has appealed from the judgment entered on the verdict on the ground that the court applied a wrong measure of damages and should have directed a verdict based upon the par value of the bonds alleged to be converted, plus the interest coupons discounted as of the date of judgment, rather than their highest market value within a reasonable time after the plaintiff learned of the conversion. The defendants have appealed on the ground that the plaintiff was only entitled to recover the 3 bonds and $3,304.39, which was a surplus of cash in defendants' hands after properly crediting the proceeds of sales upon the balances due the defendants from the pledgor Alma & Co.

■ Though it be assumed that the bonds alleged to have been converted were the property of the plaintiff, the latter cannot complain of any acts of the defendants which would have been lawful as against Alma & Co. Such is the law of New York. Thompson v. St. Nicholas Nat. Bank, 113 N.Y. 325, 21 N.E. 57. The defendants had acquired the bonds, which were negotiable instruments, without notice of the plaintiff's rights, and consequently were entitled to deal with them as though Alma & Co. had been the true owners. In Thompson v. St. Nicholas Nat. Bank, supra, Capron & Merriam, a firm of brokers, had wrongfully pledged to the St. Nicholas Bank certain bonds belonging to Thompson, giving the bank authority to sell them at public or private sale without notice and to apply the proceeds in payment of any present or future indebtedness due to it. The bank took the bonds without notice of Thompson's rights, but, after notice of such rights and demand for the return of the bonds, sold them and applied the proceeds to its claim against the brokers. In an action to recover possession of the bonds the court directed a verdict for the defendant bank. The New York Court of Appeals said in its opinion (113 N.Y. 325, at page 336, 21 N.E. 57, 59):

"The bank, having acquired a valid title to the bonds, was authorized to deal with them for the purpose of effecting the object for which they were transferred by Capron & Merriam. Talty v. Freedman's Savings & Trust Co., 93 U.S. 321 [23 L. Ed. 886]. Its right to hold the bonds continued so long as any part of the debt against Capron & Merriam remained unpaid. The plaintiffs' intestate could undoubtedly at any time have established his equitable right to a return of the bonds, and procured their surrender, by paying the amount for which they were pledged; but this he not only refrained from doing, but impliedly denied any right in the defendant, by demanding the unconditional surrender of the bonds. This he never became entitled to, and, of course, is not authorized to recover their possession in this action."

The decision in Smith v. Savin, 141 N.Y. 315, 36 N.E. 338, is relied on by the plaintiff. But it in no way modified Thompson v. St. Nicholas Nat. Bank, supra. Indeed, Peckham, J., who wrote the opinion in the former case, distinguished the latter and allowed recovery because Savin, to whom Smith's brokers had wrongfully pledged Smith's stock, sold the stock without notice to either Smith or his brokers, though Savin had no contract empowering him to sell the stock without notice in order to satisfy his lien. The decision in Le Marchant v. Moore, 150 N.Y. 209, 44 N.E. 770, likewise did not modify Thompson v. St. Nicholas Nat. Bank. The plaintiff in

that case apparently sued as the successor in interest of one who had wrongfully pledged plaintiff's securities. The defendant-pledgee, who had no knowledge of plaintiff's rights, sold the securities without notice and was held liable for conversion. No arrangement whereby the pledgee was authorized to make sales of collateral without notice was shown. We think that Le Marchant v. Moore has no bearing on the case at bar. In view of the decision in Thompson v. Nicholas Nat. Bank, supra, the question before us is whether there was any conversion as against Alma & Co. We think there was not and, if there was not, the plaintiff should fail.

■ In April, 1931, the bonds of the plaintiff, the Province of Upper Austria, which were listed on the New York Stock Exchange, had been rejected by the New York banks as collateral for loans to brokers. Toward the end of 1931, Alma & Co. were told by the defendants that the account was under-margined and would have to be put into satisfactory condition or the securities would be liquidated. The stocks in the account, with a single trifling exception, had already been sold. On March 11, 1932, the debit balance of Alma & Co. with the defendants was $60,687.46 and the securities held by the latter as collateral consisted of $71,000 par value of the 7 per cent. bonds of the Province of Upper Austria and $143,000 par of its 6½ per cent. bonds. On March 12, 1932, the plaintiff through its attorneys notified the defendants that the bonds which they held as collateral really belonged to it. This notification was afterwards repeated in writing and plaintiff demanded delivery of the bonds, though it neglected to pay the amount of the defendants' lien thereon. The defendants went on selling the bonds as opportunity offered, reporting sales to Alma & Co. on so-called confirmation slips, and Alma & Co. acknowledged in writing the correctness of defendants' account down to April 30, 1932, the acknowledgment showing a debit balance at that time of $45,735.34 and collateral on hand consisting of $46,000 7 per cent. bonds and $126,000 6½ per cent. bonds of the plaintiff. The intermediate sales and apparently all prior sales of securities including the stocks which Alma & Co. had pledged to the defendants were reported by defendants upon confirmation slips. Duplicates were mailed to Alma & Co. at its addresses in New York and Vienna, which contained the following provisions:

"It is agreed between broker and customer:

"1. That all transactions are subject to the rules and customs of the New York Stock Exchange and its Clearing House. * * *

"2. That all securities from time to time carried in the customer's marginal account, or deposited to protect the same, may be loaned by the broker, or may be pledged by him either separately or together with other securities, either for the sum due thereon or for a greater sum, all without further notice to the customer.

"3. To allow the broker to close out any or all securities in the customer's account without advance notice to the customer (whether said securities have been purchased or sold for the customer's account, delivered to or by the broker for the customer's account, or deposited by the customer or for the customer for any purpose whatever) should the margin in the customer's account become sufficiently impaired at any time in the broker's opinion to endanger the account and jeopardize the broker's interest."

The confirmation slips were not only used by the defendants in respect to sales between March 10, 1932, and April 30, 1932, at which last date the account was approved by Alma & Co., but were in general use and accompanied prior sales in the autumn of 1931, when the account was likewise approved by Alma & Co. as of November 30, 1931. (Defendants' Exhibit K.) Moreover, on April 22, 1932, the defendants sent a letter to Alma & Co. directed to the latter's New York City address at 68 William street, stating that, due to the unsatisfactory market in the securities in the account and the failure to keep good a margin satisfactory to the defendants, they deemed it necessary for their own protection to discontinue carrying such securities on margin, and saying:

"We, therefore, request that you pay us on or before May 2, 1932, $48,344.12 which is the amount of your debit balance including interest. Unless this payment is made we shall thereafter sell at our discretion, either at public or private sale, or both, without advertisement or further notice to you, sufficient of the securities held in your account to cover your debit balance."

There was no evidence that the terms of the letter were ever objected to by Alma & Co. and the defendants went on to liq-

uidate the account and to sell all the remaining bonds except the 3 left in their hands when the debit balance was liquidated on November 30, 1932. They apparently gave notice to Alma & Co. of each transaction by confirmation slips such as we have outlined.

All the bonds sold were sold on the New York Stock Exchange except 61 which were sold over the counter. Of these 61 bonds, 6 were 7 per cent. bonds sold at 30 on June 6, 1932; 25 were 7 per cent. bonds sold at 26 on June 6, 1932; and 30 were 6½ per cent. bonds sold at 18 on June 6, 1932.

The only sales of 7 per cent. bonds on the Stock Exchange at dates near June 6 were of 6 bonds sold at 22 on June 1; 4 bonds sold at 30 on June 2; and 7 bonds sold at 30 and 5 bonds sold at 29 on June 3.

The transactions in 6½ per cent. bonds on the New York Stock Exchange nearest to June 6 were sales of 1 bond at 17⅝ on June 2; 1 bond at 17⅝ on June 3; and 2 bonds at 20 on June 7.

On the basis of these sales the prices realized by the over-the-counter transactions were reasonable.

We see no legal wrong to the plaintiff from the sale of its bonds on the Stock Exchange without notice, or from the sale of the 61 bonds on June 6, 1932, without notice, over the counter. The confirmation slips, 23 of which related to sales in September, 1931, and 70 of which related to sales from March 11, 1932, to November 30, 1932 (Exhibits R, S, U, and V), provided for sales without notice, the letter of April 22, 1932, amplified the provisions of the slips by providing that the liquidation of the account might be at public or private sale, and the account submitted by the defendants to Alma & Co., as of April 30, 1932, was approved. All sales from the collateral prior to these dates had been on the Stock Exchange and the sales over the counter were after the notification of April 22. The account was undermargined and the defendants had long protested against the insufficiency of the collateral, asked in vain for proper security, and notified Alma & Co. that they would have to liquidate the account if it was not better secured.

Counsel for plaintiff argue that the only arrangement under which the collateral was held by the defendants was contained in the original agreement of February 28, 1930, made when the account of Alma & Co. was opened. (Defendants' Exhibit N.) That only provided that all securities carried by defendants on margin might be loaned or pledged for the sum due thereon or "for any greater sum." It did not mention conditions under which sales might be made and was not inconsistent with any arrangements for sales of collateral which might be made by the parties. The confirmation slips supplemented by the letter of April 22, 1932, gave defendants the widest discretion to sell in any way calculated to realize upon the collateral where the margin became insufficient. The practice which had been in vogue for many months in defendants' dealings with Alma & Co. indicates that sales were customarily made through the Stock Exchange without notice and the letter of April 22, 1932, reinforced the practice. Under such circumstances it seems plain that the sales made had the sanction of Alma & Co. and that the direction of a verdict for plaintiff on the theory that the defendants were guilty of conversion as against Alma & Co. cannot be justified.

The plaintiff further contends that the direction of the verdict for the plaintiff by the trial judge established that there was no acquiescence in the terms of the confirmation slips and of the letter of April 22, 1932. It is argued that under the opinion of Cardozo, J., in Thompson v. Baily, 220 N.Y. 471, 116 N.E. 387, we are precluded from disturbing the direction of the court below because it was equivalent to a general verdict on a question of fact. But in Thompson v. Baily, the confirmation slips were very few in number, the customer was not a man whose very business was large financial operations, but one who well might have neither read nor understood the effect of the clauses in customers' slips. Here there were many such slips providing for sales without notice, there was an established course of business under which such sales were made, and there was written approval by Alma & Co. on April 30, 1932, of defendants' accounts in which sales on the Stock Exchange without notice had occurred. It is most unlikely that an experienced dealer like Alma & Co., which was the fiscal agent for the Province of Upper Austria, should have received numerous confirmation slips, monthly statements for approval, and a letter like that of April 22, 1932, without reading and understanding the contents.

and realizing the broad powers of sale exercised by the defendants. It seems clear to us that Alma & Co. authorized or ratified the arrangement indicated in these various documents. Gillett v. Whiting, 141 N.Y. 71, 35 N.E. 939, 38 Am.St.Rep. 762. Their actions were binding on the plaintiff because the defendants were bona fide holders without notice. Therefore the trial court was in error and should have directed a verdict for the defendants except as to the 3 bonds remaining unsold and the surplus cash on hand which concededly belonged to the plaintiff.

■ Defendants make the procedural point that the supplemental complaint, asserting conversion by the sales of the bonds subsequent to the bringing of the action, should have been dismissed because such subsequent causes of action could not be entertained at law. This contention is without merit. Defendants consented to the order allowing the supplemental complaint to be filed, answered it on the merits, and made no objection on the ground that it embraced causes of action arising after the institution of the original action until after the evidence was all in. Their conduct in going to trial on the supplemental complaint and answer without objection was, in our opinion, a waiver of the procedural objections and amounted to a consent that the court adjudicate any causes of action for conversion which existed at the time when the supplemental complaint was authorized and served. While we hold that the defendants ought to have prevailed on the merits, their objections to the practice adopted, and indeed since authorized by sections 245-a and 245-b of the New York Civil Practice Act, were properly overruled.

■ Finally plaintiff's argument that any damages for conversion of the bonds of the Province of Upper Austria should have been for the par value of the bonds and attached coupons discounted as of the date of judgment is clearly unsound. The bonds had a market value which, subject to the ordinary rule in case of fluctuating securities, formed the proper basis for computing damages in case of conversion. The rule of damages contended for by plaintiff would enable an owner whose bonds were converted to obtain their face value and then to go into a falling market and use his recovery to buy bonds at but a small fraction of the par value and thus save for himself the difference as an ac-

tual profit. City of Memphis v. Brown, 87 U.S. 289, 304, 22 L.Ed. 264. Had there been any conversion, the method of assessing damages adopted by the trial judge would have been entirely correct.

We hold that there was no evidence of conversion, and that on the record the plaintiff was only entitled to payment of the cash surplus remaining on hand and to delivery of the 3 bonds remaining unsold.

The cause will be remanded to the District Court, with instructions to permit the plaintiff within ten days after the handing down of the mandate of this court to file a stipulation reducing the judgment so that it will include only the cash surplus of $3,304.39 and the three bonds. If the plaintiff fails to file such a stipulation, the District Court will enter an order granting a new trial.