## AMERICAN SURETY CO. OF NEW YORK et al. v. HILL COUNTY. (No. 8855.)*

(Court of Civil Appeals of Texas. Dallas. June 2, 1923. Rehearing Denied June 30, 1923.)

1. Counties ⬤⟾210 — May sue for aggregate damages to several road districts from conversion of bonds.

A county may bring a single suit for the use and benefit of several road districts therein to recover their aggregate damages from a conversion of bonds issued by them, especially when aided and brought about by unlawful acts of the county commissioners' court, which is the governing body for all county business (Const. art. 5, § 18), though each district, being a body politic and corporate, and sui juris, could maintain a separate suit; the judgment being a bar to any suit for the same wrongs by any of them.

**2. Trover and conversion ⬳5—Actual manual taking unnecessary.**

To constitute a conversion, which is an offense against the possession of the property converted, an actual manual taking is not necessary, but there must be such active interference with the owner's right of property or control as will deprive him of its free use and enjoyment.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Conversion.]

**3. Trover and conversion ⬳10—Use of property not essential.**

To constitute a conversion it is not necessary that the property be applied to the use of the person charged or a third person; the controlling element being the owner's loss, not the wrongdoer's benefit.

**4. Trover and conversion ⬳1—"Conversion" defined.**

To constitute a conversion, there must be a positive wrong or act of malfeasance, which may be committed by a tortious detention of the property from the owner, or by its destruction, or by an exclusion or defiance of the owner's rights, or by withholding possession under a claim of title inconsistent with that of the owner.

**5. Highways ⬳90—Contractor and surety held guilty of converting road district bonds surrendered by commissioners' court and sold in violation of statute.**

A road contractor, to whom special road district bonds ready for sale were surrendered by the county commissioners' court for sale at such price as he could obtain, and his surety, which assumed joint control of the bonds, which were sold at less than par value, and of the proceeds, which were deposited to the contractor's credit elsewhere than in the county treasury, all in violation of Rev. St. art. 632, *held* guilty of conversion.

**6. Trial ⬳180—In proceeding under law as to submission of special issues court may enter judgment without directing verdict where there are no disputed issues of fact.**

In proceeding under the law governing submission of cases to the jury on special issues, as distinguished from that governing submission on a general charge, where there are no disputed issues of fact, the court can enter a judgment without having a verdict returned on peremptory instructions. Vernon's Sayles' Ann. Civ. St. 1914, art. 1970, 1984a, 1985.

**7. Appeal and error ⬳1061(4)—No reversal to permit directed verdict where no different judgment could be rendered.**

Where no other judgment could have been rendered under the facts the appellate court is not warranted in reversing a judgment, so that a mere formality not affecting the merits of the case, such as an instructed verdict and a judgment thereon, may be gone through, whether the original judgment ignored a verdict or there was no verdict.

**8. Trial ⬳350(8)—Failure to submit issue as to surety's participation in contractor's conversion of road district bonds held not error in view of undisputed evidence.**

In a county's action against a road contractor and his surety for converting road district bonds where the evidence indisputably showed that the surety, by its indemnity bond, rendered it possible for the contractor to withdraw the bonds from the possession of the commissioners' court, and that it assumed joint possession thereof, knowing that the contractor paid nothing for the bonds and that the change of possession was for the illegal purpose of selling them below their par value, the court did not err in not submitting to the jury the issue as to the surety's participation in the conversion of the bonds.

**9. Trial ⬳350(8)—Trial court cannot pass on disputed issues of fact nor submit issue indisputably proven.**

Under Rev. St. art. 1971, as amended by Acts 1913, p. 113, § 3 (Vernon's Sayles' Ann. Civ. St. 1914, art. 1971), by substituting "only" for "solely" in the clause requiring the trial judge to submit all controverted questions of fact "solely" to the decisions of the jury, the trial court is inhibited from submitting any except controverted issues to the jury and cannot pass on disputed issues of fact nor submit issues indisputably proven.

**10. Trover and conversion ⬳46—Measure of damages value of property.**

The measure of damages for conversion of personalty is the value thereof with interest at the time of the conversion, determined usually by inquiry as to the market value.

**11. Trover and conversion ⬳50—Measure of damages for conversion of commercial paper is prima facie amount thereof.**

The value of commercial paper depending largely on the maker's solvency, the measure of damages for conversion thereof is prima facie the amount of the bill or note converted, but evidence is allowable to reduce the loss to even a nominal sum.

**12. Highways ⬳90—Measure of damages for conversion of road district bonds sold below par is par value with interest.**

The measure of damages for conversion of road district bonds sold by defendants at less than par value, in violation of the statute, is the par value thereof with accrued interest, the district's only recourse being against those enabling the bonds to get into the possession of innocent purchasers, who could not be held liable for the loss.

**13. Trover and conversion ⬳58 — Defendant may return property.**

In a suit for conversion of personalty, defendant may generally satisfy plaintiff's demands by returning the property.

**14. Highways ⬳90—Defendants must prove county suing for conversion of road district bonds sold below par could have purchased them at less than par.**

In a county's action for conversion of road district bonds sold below par, the burden was on defendants, if they desired to avail them-

---

⬳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

selves of the defense that the county could have purchased the bonds for less than par, to make such showing.

**Appeal from District Court, Ellis County: W. L. Harding, Judge.**

Action by Hill County, for the use and benefit of Special Road Districts Nos. 3, 6, 7, 10, and 12 of such county, against the American Surety Company of New York and others. Judgment for plaintiff, and defendants appeal. Affirmed.

Phillips & Townsend, of Dallas, and O. L. Stribling, of Waco, for appellant American Surety Co. of New York.

Louis, Campbell & Nicholson, of Houston. for appellant Hughes.

John B. McNamara and Williams & Williams, all of Waco, and Frazier & Averitte and Collins, Dupree & Crenshaw, all of Hillsboro, for appellants Bibb and Bibb & Hughes.

John D. Abney, of Hillsboro, and Sleeper, Boynton & Kendall, of Waco, for appellees.

JONES, C. J. Special Road Districts Nos. 3, 6, 7, 10, and 12 of Hill county, were duly created under the Hill county special road law, and each duly authorized the issuance of bonds for the building of good roads. The bonds of the several districts aggregated the sum of $904,000, and were duly issued, approved by the Attorney General, and registered as required by law. The bonds for districts 3, 6, and 7 bear date of August 9, 1919, and those of districts 10 and 12 bear date of April 10, 1920. During the summer and fall of 1920 these bonds could not be sold on the market for their par value.

W. S. Bibb, Jr., and Joe D. Hughes were partners under the firm name of Bibb & Hughes, with their offices in Waco, Tex. They were engaged in the general road construction business, and Bibb came to Hillsboro for the purpose of submitting a bid for his firm for the construction of the contemplated good roads in these five districts. The work for all of the districts, it seems, was to be embraced in one contract.

Forbidden by law to sell the bonds at less than par value and accrued interest, and unable to secure such price, the commissioners' court and Bibb, acting for his firm, on September 4, 1920, entered into an oral agreement by which Bibb & Hughes were to make an ostensible bid for the purchase of the bonds at par and accrued interest, which bid was to be accepted by the commissioners' court. In reality, however, there was to be no purchase of the bonds by Bibb & Hughes, but the bonds were to be delivered to Bibb for sale by him at such price as could be obtained for them on the market. Bibb & Hughes were to be awarded the contract on their bid for the road construction, and this bid should be for an amount sufficient to include both the cost of construction and the estimated discount at which it was contemplated the bonds would be sold. A discount of 25 per cent. was estimated as the probable discount at which the bonds would be sold, and this represented the approximate amount the accepted bid was padded. On this same day the commissioners' court entered a simulated order on its minutes to the effect that the bid of Bibb & Hughes for the bonds as for par and accrued interest was accepted, and Bibb & Hughes were awarded the contract for the construction of the roads in each of the said districts for a bid sufficiently padded to take care of the estimated 25 per cent. discount.

Under this scheme of a simulated sale of the bonds, it was contemplated by the parties that the entire issue of $904,000 of bonds would be turned over to Bibb for the purpose of sale for the best price that he could obtain in the market, regardless of whether same should be for par value and accrued interest. In fact, it was known at the time that the sale would not be at face value. In order that the good road districts might be secure against any default on the part of Bibb & Hughes, Bibb, with the American Surety Company of New York as surety, executed a fidelity bond in the sum of $500,000 of date September 5, 1920, in favor of the county judge of Hill county and his successors in office, indemnifying the county judge and his successors as employer against such pecuniary loss, not exceeding the amount of the bond, as such county judge might sustain by any act or acts of fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, or willful misapplication on the part of Bibb as an employé of the obligee during the life of the bond.

On September 21, 1920, Bibb and Bibb & Hughes, with the consent of the commissioners' court of Hill county, executed an agreement in favor of the American Surety Company of New York, in which it was specified that the county agreed to deliver the said bonds only to the said Bibb and to a representative of the American Surety Company of New York, and, in effect, that Bibb and said representative of said surety company were to have the joint possession and control of said bonds. It was also recited in said agreement that Bibb contemplated and expected to resell the entire issue of bonds so delivered to other bond buyers, and that the proceeds of the resale of said bonds were to be deposited in a depository named by the Texas representative of said surety company; said depository to acknowledge the joint control by the American Surety Company of New York over any and all money deposited in it under such account. The effect of this agreement was to place the bonds in the possession of Bibb and a representative of the surety company, and to cause the commissioners' court of Hill county to surrender possession of said bonds to those who are given no lawful right of possession.

In order to carry out this scheme, formu-

lated for the illegal purpose of selling the bonds below the minimum price fixed by law, the entire issue of the bonds was turned over to Bibb and a representative of the surety company and taken by them to Chicago, where, on the 6th of November, 1920, they were delivered by them to the purchaser secured by Bibb, and the proceeds of such sale turned over to Bibb and deposited in a bank in Chicago to the credit of W. S. Bibb, Jr.; but, at the same time, said bank issued a letter acknowledging the joint control over the deposit of the American Surety Company and agreeing that no check or draft of W. S. Bibb, Jr., on said fund should be honored unless same was countersigned by the representative of the surety company. The price paid for the bonds was 82 cents on the dollar, and this is agreed to have been the market price for the bonds at such time. The proceeds of the bonds amounted to $744,-582.22.

Under a further agreement with the commissioners' court, within ten days after Bibb received the proceeds of the sale of the bonds, he was to deposit one-fourth of said amount in banks to the credit of Hill county, and, in compliance with this agreement, he made such deposit at said time. The remainder of the proceeds was to be deposited in three installments at three, six, and nine months thereafter. There seems to be no question raised as to this part of the agreement having been carried out by Bibb. At the time the original petition was filed there was on deposit from the sale of the bonds the sum of $109,850 in the First State Bank of Hillsboro, Tex., and the sum of $120,000 in the First State Bank & Trust Company of Waco, Tex., both of these deposits being under the joint control of Bibb and the surety company. The remainder of the proceeds of the sale had gone to pay for construction work on the various roads, except 3 per cent. of same was paid to Bibb as his commission on the sale of the bonds and 2 per cent. was paid to a broker who secured for Bibb the purchaser.

The original petition was filed on April 30, 1921, with Hill county as plaintiff suing for the use and benefit of the said road districts, and W. S. Bibb, Jr., Joe D. Hughes, Bibb & Hughes, the American Surety Company of New York, the First State Bank & Trust Company of Waco, and the First State Bank of Hillsboro were all made parties defendant. As against the two named banks the suit was for the respective amounts each held on the joint account of Bibb and the surety company. As against the other defendants, it was for an alleged conversion of the bonds of said special road districts in the aggregate sum of $904,000. Recovery was also sought against Bibb and the surety company upon the said fidelity bond in the sum of $500,000.

A change of venue was ordered to Ellis county, and, upon a trial of the case, judg-ment was entered against W. S. Bibb, Jr., Joe D. Hughes, the firm of Bibb & Hughes, and the American Surety Company of New York, in favor of Hill county for the use and benefit of the said road districts Nos. 3, 6, 7, 10, and 12 of Hill county, in the sum of $461,-437.53 with interest at the rate of 6 per cent. per annum from date of judgment. Judgment was also entered against the First State Bank of Hillsboro, in favor of Hill county for the use and benefit of said road districts in the sum of $109,850, with interest from date of judgment at 6 per cent. per annum, and against First State Bank of Waco, Tex., in favor of Hill county for the use and benefit of said road districts in the sum of $120,000, with interest from the date of judgment at the rate of 6 per cent. per annum. Said banks were also perpetually enjoined from paying out said money on the joint order of Bibb and the surety company. The judgment further provided that the sums of money paid by these banks should be credited on the amount of the judgment rendered against W. S. Bibb, Jr., Joe D. Hughes, Bibb & Hughes, and the American Surety Company of New York. Judgment was given in favor of the American Surety Company on the fidelity bond.

Appellee based its cause of action on the theory that the facts, briefly stated above, constituted a conversion of the bonds by Bibb, Bibb & Hughes, and the American Surety Company, and that such conversion occasioned a loss to the several road districts in an amount equal to the difference in the price for which the bonds were sold and their par value with accrued interest. Appellee's petition was full and complete in its allegations of facts surrounding the various acts of appellants and the commissioners' court that culminated in the surrender of the bonds by the said court to appellants Bibb and the surety company, and in the sale of the bonds by Bibb for a price not permitted by law. In addition to these allegations of fact, and the charge that this amounted to a conversion of the bonds, the petition also charged that the acts done were in furtherance of a conspiracy entered into between these appellants and the commissioners' court for the purpose of evading the law in the sale of the bonds.

The answers of the various parties were likewise full and complete, and raised all the defenses that will hereinafter be discussed.

The judgment was rendered on the theory that the acts above stated constituted, as a matter of law, a conversion of the bonds, and that the measure of damages was the par value of the bonds with accrued interest, notwithstanding the market value of said bonds at the time of the conversion was considerably less.

Appellants, by appropriate assignments of error, assail the judgment rendered in the cause on the following grounds: (1) Because there was a misjoinder of causes, in that each

of the five good roads districts of Hill county is made by law a body politic and corporate, with power to sue and to be sued, and that each had a separate and distinct cause of action against appellants for the conversion of the bonds, which must be maintained by the complaining road district in its own name and its own right, and that, by reason thereof, Hill county, as plaintiff, could not maintain these five separate and distinct causes of action in one suit for the use and benefit of each of the said road districts; (2) that error was committed by the trial court in holding that, as a matter of law, the facts developed at the trial of the case constituted a conversion of the bonds, and that there were disputed issues of fact that called for their submission to the jury; (3) that as the case was tried before a jury, it was error for the court to deprive the jury of its function to return a verdict in the case, and that as there was no verdict returned by the jury, except as to the participation of appellant Hughes in the acts that constituted the conversion, the court was powerless under our procedure to enter a judgment, and it was error to do so; (4) that the court was in error in holding that the measure of damages was the par value of the bonds with accrued interest, in the face of the fact that the agreed market value of the bonds was 82 cents on the dollar. These assignments will be discussed in their order.

[1] Did appellee have the right to maintain this suit for the use and benefit of the five several road districts for their aggregate damages for the conversion of the bonds? Unquestionably, each of these road districts, being a body politic and corporate, and made sui juris, could have maintained a suit against appellants for its alleged wrongs and consequent damages. This, however, is by no means conclusive of the question. The Constitution makes the commissioners' court the governing body for all county business. This court is the medium through which the different counties of this state act. It constitutes the executive board for administering the affairs of the county. State Constitution, art. 5, § 18; Elec. Light Co. v. Keenan, 88 Tex. 201, 30 S. W. 868. In fact, the duties of the commissioners' court relate only to county business. Such court is required by statute to issue the road district bonds when they are authorized; to fix the rate of interest such bonds shall bear, same to be not less than 5 per cent., nor more than 5½ per cent. per annum; to have such bonds examined by the Attorney General and, if approved, registered by the comptroller; to hold the custody and control of the bonds, and to sell them to the highest bidder for cash at not less than par value and accrued interest; to place the purchase money in the county treasury of the county to the credit of the available road fund for such road district. The statutes further provide that the county

treasurer shall pay out such funds upon warrants issued by the county clerk upon accounts certified by the road superintendent of such road district and approved by the commissioners' court of the county. It is, in reality, the county performing these various duties through, and by means of, its commissioners' court.

The record shows that all the road bonds were duly issued by the commissioners' court, examined and approved by the Attorney General, registered by the comptroller, and placed in the custody and control of the commissioners' court, and there held until they were wrongfully delivered to appellants. Hill county, through the duties required of its commissioners' court, was charged by law with such responsibilities respecting the issuance, custody, and sale of these bonds that it could institute a suit, in the manner in which this suit was instituted, for a wrongful conversion of the bonds, especially when this wrongful conversion was aided and brought about by the unlawful acts of its board of commissioners. Watson v. El Paso (Tex. Civ. App.) 202 S. W. 126. The acts charged as constituting conversion comprehended all of these districts, and, if the suits were separate, all of the evidence here introduced would have been introduced in each of the suits. No harm could possibly result to appellants by reason of the manner in which this suit was brought. The suit being brought for the use and benefit of each of the road districts, they are all in court, and the judgment would be a bar to any suit for the same wrongs that could be brought by any of these road districts. The assignments of error on this matter are overruled.

[2] Was there a conversion of the bonds by Bibb, Bibb & Hughes and the surety company? The definitions given the word "conversion" are almost as varied as the use of the word in judicial decisions. The words employed though, in the various combinations to define the term, usually carry the same meaning and have the same import. The brief definition given by Mr. Cooley is perhaps more generally used. It is, "Any distinct act of dominion wrongfully exerted over another's property, in denial of his right or inconsistent with it, is a conversion." Another definition approved by Mr. Bowers in his work on "The Law of Conversion" is:

"A conversion of personal property takes place wherever a person who is neither the owner nor entitled to the possession exercises dominion or control over it inconsistent with or in defiance of the rights of a person who is either in possession or entitled to the immediate possession."

A still more specific definition is that approved by this court in France v. Gibson, 101 S. W. 536:

" 'Conversion' is the unlawful and wrongful exercise of dominion, ownership, or control by

one person over the property of another, to the exclusion of the exercise of the same rights by the owner, either permanently or for an indefinite time, and may be effected by taking actual corporal possession and control over the property of another so as to prevent the owner from the exercise of such rights."

[3] It necessarily follows from these definitions that conversion is an offense against the possession of the property alleged to have been converted. It also follows that it is not necessary that there be an actual manual taking of personal property to constitute a conversion, but there must be such active interference with the owner's right of property or control as will deprive him of its free use and enjoyment. Nor is it necessary that the property be applied to the use of the one charged with conversion, nor even of a third person; the element of controlling influence being the owner's loss and not the wrongdoer's benefit. Bowers on Law of Conversion, § 2.

[4] It must also be remembered that every taking of property from the possession of the owner, or the one entitled to its possession, is not necessarily a conversion of the property. One person might hold possession of the property of another not inconsistent with the rights of the owner. Generally, before there can be a conversion of property, there must be an act of malfeasance and not a mere nonfeasance; a positive wrong and not the mere omission of what was right. This act of malfeasance may be committed by a tortious detention of the property from the owner, or by a destruction of the property, or by an exclusion or defiance of the owner's right, or the withholding of possession under a claim of title inconsistent with that of the owner. Lee Tung v. Burkhart, 59 Or. 194, 116 Pac. 1066; Taugher v. Railway Co., 21 N. D. 111, 129 N. W. 747.

[5] The inquiry as to whether there was a conversion of the bonds must be determined by an application of the above announced principles to the facts of this case in the light of the statutory duties of the commissioners' court in reference to these bonds. Article 632 of the Revised Statutes defines these duties, and is as follows:

That "such bonds * * * shall continue in the custody of, and under the control of the commissioners' court of the county in which they were issued, and shall be by said court sold to the highest and best bidder, for cash, either in whole or in parcels, at not less than their par value, and the purchase money therefor shall be placed in the county treasury * * * to the credit of the available road fund of such county, or of such political subdivision or defined district of such county, as the case may be."

This provision of the statute was incorporated in the Hill county special road law under which the bonds were issued. The commissioners' court could not delegate the duties thus imposed to any one else. One of these nondelegable duties is to retain in itself the custody and control of the bonds until they are sold. If it surrendered the custody and control of these bonds to others, there would be a plain violation of this statutory duty, and, as all persons are charged with knowledge of its duties and limitations, the possession of those to whom this surrender was made would be an unlawful one. Their subsequent custody and control of the bonds could receive no recognition from the courts, and no act of the commissioners' court could make such possession valid. Such an act of the commissioners' court would be tortious—a malfeasance—and any one so aiding in the commission of such act as to render its performance possible would be equally guilty of malfeasance.

The record in this case indisputably shows that when these bonds were printed, approved by the Attorney General, and registered by the state comptroller, and were ready for sale, their custody and control was surrendered to appellants, and appellants thereafter assumed and held such custody and control of them. The possession thus given appellants, under the facts of this case, was not that of a mere depository for safe-keeping in which the commissioners' court still held control and dominion over the bonds, but was a possession absolute and exclusive. Bibb, and not the commissioners' court, was to exercise discretion as to when and where the bonds would be sold; and Bibb, and not the commissioners' court, was to determine the price they would bring. In all these matters Bibb could not act except jointly with the surety company. The bonds could not be moved from where they were deposited except with the consent of the surety company, and Bibb could not carry them to the purchaser in Chicago except in company with its agent. When the possession of these bonds was surrendered by the commissioners' court it was to the joint possession of Bibb and the surety company. When the purchaser had been found, and it was necessary to carry the bonds to Chicago for delivery to such purchaser, this could not be done except by a joint carriage of Bibb and such agent of the surety company. When the proceeds of the sale of the bonds were deposited in the bank to the credit of Bibb, a letter was at once issued by the bank acknowledging the joint control of the proceeds of this sale by both Bibb and an agent for the surety company.

Should the law hold the surety company blameless in all the wrongs perpetrated by Bibb and the commissioners' court? It made itself a part of the many illegal and unlawful proceedings to which the bonds were subjected. It could not have acted innocently and without knowledge. The law charged it with knowledge of the limitations on the power and authority of the commissioners' court to deal with the bonds. It knew when it voluntarily assumed joint control of these bonds

with Bibb that the commissioners' court could only surrender such control to a bona fide purchaser on payment in cash of the purchase price. Until this was done, it knew that the only rightful possession, custody, and control of the bonds was in the commissioners' court. It knew that Bibb had no right to exercise his discretion in the sale of the bonds, and knew also that the bonds could not be sold for less than par value. It knew, when it took to itself joint control of the money deposited in Chicago to the credit of Bibb, that the only legal depository was that of the county treasury of Hill county. In fact, it was the acts of the surety company that rendered possible the consummation of the scheme of Bibb and the commissioners' court for the illegal sale of the bonds. These acts of appellants in dealing with these bonds were in violation of the law and tortious. Jones v. Veltmann (Tex. Civ. App.) 171 S. W. 287; Peoples Guaranty State Bank v. Castle (Tex. Civ. App.) 218 S. W. 519; Laverty v. Snethen, 68 N. Y. 522, 23 Am. Rep. 184; Patek v. Patek, 166 Mich. 446, 131 N. W. 1101, 35 L. R. A. (N. S.) 461.

The result of this unlawful dealing with the bonds by Bibb and the commissioners' court, actively participated in by the surety company, was that they were taken from the possession of the said court, their only legal custodian, and sold at a ruinous discount, in violation of law, to the damage of these road districts and their taxpayers. This was a conversion of the bonds. The assignments of error attacking the conclusion of the court on this issue are overruled.

[6] It is insisted by Bibb and the surety company that there was reversible error because there was no jury verdict in the suit against them, and that by reason thereof the court was without power to enter judgment against them; that, if there was no contested issue of fact to be passed upon by the jury, then the only procedure the court could adopt was to instruct a verdict and, upon this instructed verdict, render judgment. This course not having been adopted by the trial court, the judgment entered was a nullity.

By request of the parties it became the duty of the court to submit this case on special issues, and the law governing the submission of special issues controls. Under this law there is no verdict in favor of plaintiff or defendant, but only a verdict on contested issues of fact. If the evidence is undisputed on all issues of fact made by the pleadings, there is necessarily no issue to be submitted to the jury. When these issues of fact are determined by the jury, usually in the form of answers to separate and distinct questions submitting the material contested issues of fact, and returned into court, this becomes the verdict of the jury. It then becomes the duty of the court to render the judgment authorized by the pleadings, by the findings of the jury on the disputed issues of fact, and by the undisputed facts as shown by the evidence in the case. If there be no disputed issues of fact, manifestly there can be no submission to the jury and no verdict. We therefore hold that where the trial court is proceeding under the law governing the submission to the jury of a case on special issues, as distinguished from the law governing a submission on a general charge, a judgment can be entered by the court without going through the form of having a verdict returned on peremptory instructions. Vernon's Sayles' Texas Civil Statutes, arts. 1970, 1984a, 1985; Fant v. Sullivan (Tex. Civ. App.) 152 S. W. 515; H. B. & T. Co. v. Lynch (Tex. Com. App.) 221 S. W. 959; White v. Bell (Tex. Civ. App.) 242 S. W. 1082.

[7] There is another ground in favor of the action of the trial court, equally as tenable and equally as conclusive against appellants on this contention, and that is that under the facts of this case no other judgment could have been rendered than the one that was entered. In Fant v. Sullivan, supra, the court, in reviewing the action of the trial judge in entering a judgment contrary to the findings of the jury for the reason that the findings were unsupported by the evidence, said:

"We see no useful purpose to be subserved by sending the case back for a new trial on account of the shadowy objection that the judgment recites that it was rendered on a motion for judgment notwithstanding the verdict. Nor do we deem it necessary merely on account of such recital to reverse the judgment and here render judgment to the same effect."

If this case were reversed it would require the trial court, under the view taken of the case by this court, to give peremptory instructions in favor of appellee on the issue of conversion of the bonds by these appellants. Higher courts are not warranted in reversing a case so that a mere formality which does not affect the merits of the case may be gone through, and then enter the same judgment as that presented on appeal. Appellants insist that the action of the court in taking the case from the jury destroyed the functions of the jury. What are the functions of the jury? Under a case submitted on special issues, only to pass on disputed facts. Where there is no disputed fact there is no function of the jury to be performed or destroyed.

Counsel for appellants also insist that the case of Fant v. Sullivan, supra, is not authority on the power of a court to render judgment without a verdict of a jury, when a case is tried to a jury, for the reason that there was a verdict of the jury in that case, and impliedly insist that the functions of the jury were not therefore destroyed by the trial court. The judgment, though, ignored the verdict of the jury and was directly contrary to it. We are unable to see any distinction

favorable to appellants' contention in a case where the court permitted a verdict of the jury and then ignored it in entering judgment and in a case where there was no verdict of the jury permitted. If the jury had any function to perform in either case, it is equally destroyed by the action of the court.

[8] It is also insisted that there were controverted issues of fact as to the participation of the surety company in the wrongs committed by the commissioners' court and Bibb, and that it was error not to submit these issues to the jury. We do not agree with this contention. The facts indisputably show that the surety company rendered it possible for Bibb to withdraw these bonds from the possession of the commissioners' court by its indemnity bond, and then made this possession of Bibb secure and the exclusion of the commissioners' court complete by assuming joint possession with Bibb. The evidence indisputably shows that the surety company knew that at the time possession was relinquished by the commissioners' court those to whom the possession was given did not pay anything for the bonds. The evidence also indisputably shows that the surety company knew that this change of possession was for the illegal purpose of selling the bonds for a sum below their par value. We therefore hold that there was no issue of fact to go to the jury as to the participation of the surety company in the conversion of these bonds.

[9] Appellants place great reliance on the case of Ablowich v. Greenville National Bank, 95 Tex. 429, 67 S. W. 79, 881, to sustain them in their contention under this assignment of error. In that case the suit was for a debt and foreclosure of a mortgage lien. The judge instructed the jury as to the lien, but the jury omitted from its verdict a finding for the lien, but did find for plaintiff as to its debt. It was undisputed in the proof that the lien existed. Because of this fact, the trial judge entered judgment foreclosing the lien. The Supreme Court reversed and rendered that portion of the judgment foreclosing the lien. It was held in that case that a court has no power to enter judgment upon facts well pleaded and indisputably proved, unless the issue presented and proved had been found by the verdict of the jury in favor of the party for whom judgment is rendered. That case was decided prior to the enactment of the present statutes in reference to the submission of a case to a jury on special issues. When that opinion was delivered, article 1971 of our Revised Statutes, which was article 1317 of the 1895 Statutes, contained this clause:

"He [the trial judge] shall decide on, and instruct the jury as to the law arising on the facts, and shall submit all controverted questions of fact solely to the decision of the jury."

The effect of this clause was to make the jury the sole arbiter of all disputed issues of fact, and also to inhibit the trial court from deciding any question of disputed fact that had arisen in the trial of a case. It did not inhibit the trial court from submitting to the jury undisputed issues of fact. This clause was slightly amended by the Acts of 1913 when our special issue law was enacted, and this clause of article 1971 now reads:

"He [the trial judge] shall decide on, and instruct the jury as to the law arising on the facts, and shall submit all controverted questions of fact only to the decision of the jury." Vernon's Sayles' Ann. Civ. St. 1914, art. 1971

—the word "only" being substituted for the word "solely." The effect of this clause now is to inhibit the trial court from submitting any except controverted issues to the jury. As it now reads it makes the jury the final arbiter of all disputed questions of fact that may arise on the trial of a case, and inhibits the trial court from passing on disputed issues of fact when there is a trial by jury; and, further, it inhibits the trial judge from submitting any issue of fact indisputably proven to the jury.

If the law as it now exists relative to submission of a case on special issues had been in force at the time the Ablowich Case was tried, and either of the parties had requested its submission under this law, the trial court could not have submitted to the decision of the jury the issue of the foreclosure of the mortgage lien for the reason that it was an issue indisputably proven. It would have been the duty of the court to enter the judgment of foreclosure in response to the undisputed evidence in the case. The decision in Fant v. Sullivan, supra, distinguishes that case from the Ablowich Case in language that aptly applies to the case at bar:

"It should be borne in mind that the Ablowich Case was not submitted upon special issues, but upon a charge specifically submitting the issues both of debt and mortgage, and the jury found only upon the debt, which was held by the Supreme Court to constitute a finding against the mortgage. The trial court rendered judgment for foreclosure of the mortgage in the face of an express finding by the jury against it, which was held to constitute [reversible] error."

Did the trial court adopt the correct measure of damages? On the trial of this case it was agreed by all the parties that the market value of the bonds at the time they were sold in Chicago by Bibb was 82 cents on the dollar, the price obtained for them. It does not appear what the market value of these bonds was at the time of the trial. On this state of the record the trial court held that appellee's measure of damages for their conversion was the face value of the bonds, together with accrued interest, and he gave judgment for this amount with 6 per cent. interest from the date of the judgment, ignoring the agreed evidence as to their market value.

[10] It is unquestionably the general rule,

as appellants insist, that in an action for damages for the conversion of personal property the measure of damages is the value of the property at the time of the conversion with interest. This value is usually determined by an inquiry as to the market value of said property at the time it was converted. The decisions of all the courts recognize that the object sought to be obtained by this rule for assessing damages is full compensation for the injury sustained. An amount which would place the injured party in the same position he would have occupied had no loss occurred is what is necessary to satisfy the demands of justice, and no rule for the measure of damages should be adopted that does not measure up to this requirement. If this general rule does not do so in the particular case under inquiry, the courts unhesitatingly have adopted a rule that would satisfy the requirement of full indemnity for the wrong done.

[11] It may be generally stated in reference to all commercial paper that the value of the paper is in a large measure dependent upon the solvency of the maker. In a suit for the conversion of ordinary commercial paper, it is universally held that the loss is prima facie the amount of the bill or note converted. Evidence, however, is allowed to reduce this loss even to a nominal sum. In the case of Kirkpatrick v. San Angelo Nat'l Bank (Tex. Civ. App.) 148 S. W. 362, the court gives general recognition to this rule with reference to the measure of damages for the conversion of commercial paper; and also, impliedly, at least, makes the par value of bonds, safeguarded as these bonds are, the measure of damages for their conversion. That suit was for the conversion of a thousand dollar bond issued by the city of San Angelo for school purposes. The court says:

"The evidence offered by plaintiffs in the case at bar made a prima facie case as to the value of the bond. It devolved, as we think, upon the defendants to show, if they could, that it was of less value than its face represented it to be. But, apart from this, we are inclined to believe that, since it was shown that this bond, as well as the others, had been approved by the attorney general and registered by the comptroller at the time of its loss, it became unnecessary for plaintiff to make further proof of its value, because such approval and registration not only evidenced the fact that all formalities had been complied with in respect to their issuance, but was equivalent to a finding in favor of the solvency of the municipality of San Angelo, which had issued it, whereby it imported that it was worth, prima facie at least, its face value."

[12] The state of Texas, by statutory enactment, has thrown such safeguards in favor of the investor in bonds around the issuance of bonds for road improvements as that the investor in such securities is absolutely assured that the taxable values of the district issuing the bonds are amply sufficient to take care of both the interest and the principal of the bonds as they mature. The attorney general is required by statute to certify to facts as will absolutely import solvency of the maker of the bonds. After throwing such protective safeguards around the issuance of the bonds in behalf of the purchaser and making him absolutely secure in the property he has purchased, the state has declared by solemn enactment that such bonds as these under inquiry shall not be sold for less than their par value. This the state unquestionably had a right to do. It says to the investor: -

"Our laws make you secure in the collection of the bonds and the interest, and, because of this security, you cannot deal in the bonds of this state, issued for the purposes for which these bonds were issued, except on the basis that you must pay to the maker of these bonds a minimum price of par value."

This law also safeguards the taxpayer who votes these bonds, in that it guarantees to him that the bonds he authorizes by his vote shall net him a full return for his taxes.

The issuance of these bonds was authorized by these good road districts at a time when, perhaps, by reason of the general financial depression of the country, they could not be sold for their par value. It was the plain duty of the commissioners' court to hold them until such price could be obtained, for only in that way could the general policy of the state, as declared by statutory enactment, be carried out. In order to defeat this declared policy of the state, the plan or scheme as above detailed was devised. It was a plain evasion of the law. It was an attempt to do indirectly that which could not be done directly. It resulted in a loss to the taxpayers of these districts in an amount equal to the judgment in this case. Appellants are the ones who either perpetrated this wrong or aided and assisted in its perpetration. If the surety company, with the knowledge it had of the transactions when it aided Bibb and the commissioners' court in this evasion of the law, instead of making it possible for others to do so, had purchased these bonds in its own right, it could have been made by suit to pay the par value of the bonds and accrued interest. In other words, it could have been made to pay the amount recovered in this case. It knew that Bibb and Bibb & Hughes were not the owners of the bonds and had not purchased them for par value, and knew, also, that the commissioners' court, as the constituted agent of these road districts, was not receiving the required par value for these bonds. Bay City v. Lumberman's State Bank, 193 Mich. 533, 160 N. W. 425; Koochiching Co. v. Elder, 145 Minn. 77, 176 N. W. 195. In fact, learned counsel for appellant surety company virtually concede this rule of law in their reply brief, in their review of the above cases cited. In each of the states in

which those cases arose there is a law similar to ours forbidding sale of the bonds under inquiry in those cases for less than their par value. An evasion of this law was attempted to be made by the purchasers by bidding the par value of the bonds, but charging a large commission for their sale, and suit was filed in each case to recover the difference between what was received for the bonds and their par value. In each case the court held that the purchaser was liable for the par value. In reviewing these cases, counsel for appellants say: "Of course, as a purchaser of the bonds, Elder was liable for the amount which the law fixed as a purchase price." Why was he liable for it? Because the law measured the damages that the tax payer suffered by reason of this attempted evasion of the law.

In the instant case the records of the commissioners' court were so manipulated as to cause them to show to the purchaser of these bonds that Bibb had purchased them from the county at par value and, as the apparent legal owner of the bonds, having purchased them for a price allowed by law, he could sell them for any price he chose. The purchasers of these bonds were thus innocent of any wrongdoing and could not be held liable for the loss that these good road districts sustained. Their only recourse is against those who enabled the bonds to get into the possession of one who could make the defense of innocent purchaser.

In Milliken v. Callahan County, 69 Tex. 205, 6 S. W. 681, which was a suit for damages by the county for conversion of bonds issued by the county, the court says:

"There was no necessity to prove the value of the bonds. The county was bound for their par value, and that was the amount of damage suffered by it in consequence of their being in circulation."

To hold in the case at bar that the measure of damages is not the par value of the bonds with accrued interest is to proclaim the impotency of the law to protect the taxpayer in his statutory guaranty. It would be to advertise the fact that an evasion of this statute forbidding the sale of these bonds for less than their par value can be legally accomplished by adopting the same course as was taken by appellants and the commissioners' court in this case. Aside from this, however, it would require this court to apply a rule for the measure of damages in a suit for conversion that did not allow adequate damages for the wrong suffered; to apply a rule that would not give full compensation for the injury sustained, and thus defeat the very object that called the rule into existence.

[13, 14] It is urged that the views here expressed as to the measure of damages in this case are contrary to the rule announced in Memphis v. Brown, 20 Wall. 289, 22 L. Ed. 264. It is not believed that a close study of the Brown Case will sustain this contention, but, on the contrary, will disclose that the cases are distinguishable. In the reported case the city of Memphis had contracted with Brown to pave its streets, for which the city was to issue bonds. It had authority under its charter to issue bonds in the sum of $900,000. The city undertook to require the cost of the paving to be paid by those who owned the abutting property without making use of its bonds, but in its contract with Brown it guaranteed payment of such part of the debt for paving as the abutting property owners failed to pay. The abutting property owners failed to respond, in their payments and the city loaned Brown its bonds in the sum of $240,000, with the understanding that the bonds would be sold by Brown and the proceeds used in the paving work, the bonds to be replaced by others to be bought by Brown. These bonds were only worth on the market 50 cents on the dollar. Without replacing the bonds, Brown brought suit against the city for the amount owing him on the paving contract, and the city filed a bill in equity against Brown for specific performance of his agreement to replace the bonds and for an injunction. These suits were consolidated and on the trial specific performance was denied, the court holding that the city could be compensated in damages. At the time of the trial of the suit it was shown by evidence that these bonds could be purchased in the market at 50 cents on the dollar, and the court held that since the city could make itself whole by purchasing the bonds on the market at that price, it was entitled only to a credit for that amount on the debt it owed Brown under the paving contract. The bonds under inquiry in that case could not be legally sold for less than par value. It is the general rule in a suit for conversion of personal property that the defendant could satisfy the demands of the plaintiff by returning the property. If these bonds at the time of the trial could have been purchased by Hill county for the road districts for 82 cents on the dollar, and appellants desired to avail themselves of this defense, the burden was upon them to make this showing. This they did not attempt to do, but relied wholly on showing what the market value was at the time of conversion. As we understand the decision in Memphis v. Brown, it was the fact that these bonds were available and could be purchased at the time of the trial for the price of 50 cents on the dollar that moved the court to make the holding announced above.

We are of the opinion that the trial court was correct in its holding that the measure of damages was the par value of the bonds and accrued interest, and appellants' assignments of error on this issue are overruled.

Appellee has assigned error on the holding of the trial court denying recovery on the indemnity bond executed by the surety com-

pany with Bibb as principal. This was only a fidelity bond and it was not shown that any of its conditions had been breached. This cross-assignment of error is therefore overruled.

Finding no reversible error, the case is affirmed.

DAYTON B. STEED, of Sherman, Tex., sat as Special Associate Justice in this case; Judge VAUGHAN not sitting, having been of counsel for appellee.

─────────
☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes