ARAMCO SERVICES COMPANY, et al., Appellants and Cross Appellees,

v.

REDLAND FABRICATING AND WELDING, INC., Appellee and Cross Appellant.

No. C14–87–321–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 2, 1988.

Rehearing Denied June 30, 1988.

John P. Cahill, Kent W. Robinson, Houston, for appellants and cross appellees.

Andrew R. Harvin, Houston, for appellee and cross appellant.

Before JUNELL, SEARS and CANNON, JJ.

## OPINION

CANNON, Justice.

This appeal arises from a judgment rendered in favor of plaintiff, Redland Fabricating and Welding, Inc. ("Redland"), for actual damages based on claims of conversion, tortious interference with contract, and conspiracy to convert and to tortiously interfere. The named defendants were Bechtel, Inc. of Nevada, Bechtel Power Corporation, and Bechtel, Inc. (collectively referred to as "Bechtel"), Aramco Services Company ("Aramco"), International Specialty Products, Inc. ("ISP"), and Blas–

Kote, Inc. ("Blas–Kote"). In response to special issues, the jury found in favor of Redland on each of its asserted causes of action and found each of the defendants liable for actual, consequential and exemplary damages. The trial court rendered judgment against Aramco, Bechtel, and Blas–Kote, jointly and severally, for actual damages for the value of the products converted and for the damage proximately caused by the loss of the products. The trial court found there was no evidence of malice to support the imposition of exemplary damages and denied that award as to all defendants. Aramco, Bechtel, and Redland each appeal from the final judgment. ISP and Blas–Kote went out of business, failed to appear at trial, and are not parties to this appeal.

Finding no evidence to support the jury's verdict, we reverse the judgment of the trial court and render judgment that Redland take nothing.

In 1976 Aramco was engaged in building a power plant, the Ghazlan Project, in Saudi Arabia. It contracted with Bechtel to provide certain services for Aramco in connection with the project, including assistance in equipment engineering, design, procurement, expediting, and inspecting. Among the hundreds of items required for the Ghazlan Project were two steel water screens and a stop log. Aramco contracted with ISP that these custom-made items would be fabricated and shipped by July 1979. Aramco agreed to pay ISP $27,783 for the goods. ISP was unable to perform its contract. Finally in January 1980, ISP subcontracted with Redland to fabricate the goods for $23,000. The ISP/Redland purchase order provided, in pertinent part, the following:

I. ACCEPTANCE. Commencement of performance pursuant to this Purchase Order constitutes acceptance hereof [Redland].... This Purchase Order and the terms stated hereon shall constitute the entire agreement between the parties.... No modifications of this order shall be binding on [ISP].

III. PRICES AND PAYMENTS. [Redland's] price shall not be higher than last quoted or charged to ISP unless otherwise agreed to in writing.

XII. BANKRUPTCY. In the event of any proceedings, voluntary or involuntary, in bankruptcy or insolvency by or against the Seller [Redland], including any proceeding under the Bankruptcy Act, or in the event of the appointment, with or without the Seller's consent, of an assignee for the benefit of creditors or of a receiver, or in the event that the Company [ISP] has reasonable cause to believe Seller is or will become insolvent, then Seller shall be entitled to cancel any unfulfilled part of this Purchase Order without liability whatsoever and to immediately gain possession of any finished or partially finished work.

Significantly, the contract does not provide for progress payments or for payment before ISP obtained possession of the goods. It is undisputed that the industry standard is for buyer (ISP) to pay seller (Redland) upon shipment and delivery.

Under its contract with Aramco, Bechtel was responsible for providing design and technical specifications and for monitoring and inspecting the work. However, neither Bechtel nor Aramco knew that ISP had agreed to subcontract the project until after the purchase order was signed. Nor did Bechtel or Aramco know the terms of the contract or the history of previous business controversies between ISP and Redland. Redland began work in mid-February in its shop in Lufkin, Texas. The goods were to be made out of a common, low grade structural steel. Although the fabrication was not considered a difficult or complex job, Redland encountered problems when ISP provided Redland with an incorrect set of fabrication drawings. As a result, much of the work had to be redone and Redland fell behind schedule. In April 1980 representatives of Aramco, Bechtel, ISP, and Redland met at the Lufkin plant to resolve various problems. At that meeting pre-existing disputes over non-payment by ISP surfaced. Coy Coon, owner of Redland, announced that Redland would not release the products to ISP unless ISP paid Redland for the water screens and made

full payment for its previous contracts (not related to the Aramco project). So intense were his feelings that he threatened to make scrap out of the goods rather than to release them before Redland was paid. It is undisputed that at the Lufkin meeting and on subsequent occasions when references were made to the financial dispute between Redland and ISP, the representatives of Bechtel and Aramco gave no assurances that they would guarantee Redland's payment under its contract with ISP. Mr. Coon admitted that at no time was Redland looking to Bechtel or Aramco for payment on the ISP/Redland contract, nor did he ask Aramco to refuse delivery of the product.

In August 1980, still not complete, the products were shipped by Redland to Blas–Kote, a coating and finishing yard in Houston. Some repair welding was necessary and was done at the Blas–Kote yard in part by Redland and in part by other welders hired by ISP. Mr. Coon instructed Blas–Kote that Redland would pay Blas–Kote for its services. On September 22, 1980, Mr. Coon visited the Blas–Kote yard to check on the products. When he arrived, he saw two 18–wheel trucks and saw several workmen crating the Redland water screens. Representatives of ISP and Bechtel were on hand. Mr. Coon thought that two unnamed Aramco inspectors were also present, although all other witnesses denied this fact. Seeing that the products he had manufactured were about to be removed without his permission, Mr. Coon was infuriated. He demanded that the workmen stop and that the truckers leave because the goods were not to be shipped until ISP paid Redland. Until Redland was paid, Mr. Coon considered that the goods belonged to Redland. Blas–Kote's president, Mr. Lawrence Stollenwerk, assured Mr. Coon that the goods would not be stolen from Redland. Despite the assurances of Mr. Stollenwerk to Mr. Coon, early in the morning of September 23, just hours after Mr. Coon left the Blas–Kote yard, still unpaid by ISP, the goods were shipped by truck to Aramco's dock in Galveston. They were eventually shipped on to Saudi Arabia. On October 9, Aramco paid ISP according to the terms of its contract. ISP never paid Redland.

In its original contract with ISP, Aramco had required specific material certifications and material test reports be provided with the finished products. These were in Mr. Coon's possession on September 22, and he refused to surrender them without payment for the goods. Unknown to Mr. Coon, earlier in the month Bechtel, anxious to prevent further delays, had decided that certain welding requirements would be waived as well as the material test reports. The material test reports were inconsequential where low grade steel was to be used in the fabrication. Bechtel employees had further determined that the products would be crated on September 19 and shipped to Galveston on September 22. A Bechtel inspector had released the equipment for shipment without advising Redland. Bechtel conducted a final inspection of the goods on September 22. After this inspection, ISP asserted its right to possession of the goods under its contract with Redland, basing its claim upon the insolvency provision of article XII (set out above), and by this means, ISP convinced Mr. Stollenwerk that Blas–Kote should release the equipment to it.

Upon learning that the goods had been removed by ISP from the Blas–Kote yard, Mr. Coon retained an attorney. The lawyer called the Aramco dock, the Bechtel offices, and the president of ISP. Mr. Coon visited the Aramco offices, attempting to contact its president, Mr. Wasson. When advised that Mr. Wasson was not there, Mr. Coon left a message for Mr. Wasson, which he dictated to the president's secretary. Nevertheless, Mr. Coon and his attorney were unable to stop shipment.

The original suit underlying this appeal was filed by ISP against Redland, claiming commercial defamation. Redland counterclaimed, demanding payment under several of its contracts with ISP, including that for work done on the water screens. The suit was fifteen months old before Redland filed a third party action against Bechtel, Aramco, and the now defunct Blas–Kote.

Against Bechtel and Aramco, Redland alleged conversion, tortious interference with its contractual relationship with Blas–Kote, conspiracy to convert goods, and conspiracy to interfere with contractual relationships.

Trial to a jury resulted in finding that each of Bechtel, Aramco, and Blas–Kote had committed one or more of the acts establishing liability and that such acts were done with malice. The jury found the value of the goods to be $32,000, consequential damages to be $128,226, and exemplary damages totalling $800,000. The trial court entered judgment non obstante veredicto against these three defendants, jointly and severally, for $32,000 plus interest at six percent per annum from September 23, 1980, until the date of judgment and at ten percent per annum thereafter, and for $128,226 plus interest at ten percent per annum from the date of judgment. It further awarded attorneys' fees. Determining that there was no evidence to support the issues submitted on malice and exemplary damages, the court disregarded them. The suit of ISP against Redland for defamation was dismissed for want of prosecution. Bechtel and Aramco appeal the finding of liability and damages. Redland prays that this court reverse the trial court and render judgment re-instating the exemplary damages found by the jury; it further prays that interest be awarded on all actual damages at the rate of ten percent per annum, compounded daily from March 23, 1981 until judgment.

This is primarily a "no evidence" case. In addressing the points of error raised by appellants Bechtel and Aramco, we consider only the evidence to support the finding, and we disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). Because the roles of Bechtel and Aramco were very different, we must deal with each appellant separately.

In Bechtel's first point of error, it complains that the trial court erred in failing to disregard the jury's answer to special issue number one, inquiring about conversion, because there is no evidence that Bechtel exercised dominion and control over the goods allegedly converted. We agree.

■ Conversion is the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights. *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex.1971); *Branham v. Prewitt*, 636 S.W.2d 507, 510 (Tex.App.— San Antonio), *writ ref'd n.r.e. per curiam*, 643 S.W.2d 122 (Tex.1982). There must be an act of malfeasance, an intentional wrongdoing, not merely the failure to do that which is right. *Branham*, 636 S.W.2d at 511, *quoting American Surety Co. v. Hill County*, 254 S.W. 241, 246 (Tex.Civ. App.—Dallas 1923) *aff'd*, 267 S.W. 265 (Tex.App.1924). Bechtel's last affirmative act with respect to the goods was to inspect the goods and to release them from an engineering and technical perspective as complying with the contract. A buyer has a right before payment or acceptance of goods to inspect them at any reasonable place and time and in any reasonable manner. TEX.BUS. & COM.CODE ANN. § 2.513 (Tex.UCC) (Vernon 1968). ISP was entitled to have Bechtel conduct its inspection. Moreover, the actions of Bechtel were a required step in the process of getting the goods to Saudi Arabia. The act was neutral with respect to right of possession of the goods and as to payment for their manufacture. Redland failed to present any proof that Bechtel exercised dominion and control over the goods, the most basic element of the claim of conversion. Bechtel's first point of error is sustained.

■ Appellant Aramco raises identical contentions in its first point of error, but Aramco cannot deny that it exercised dominion and control over the goods. Also, there is some evidence that after it accepted delivery Aramco knew that Redland still claimed the goods: Mr. Coon testified that "two gentlemen" from Aramco were only six or seven steps away when he was shouting at Mr. Stollenwerk of Blas–Kote and Mr. Fisher of ISP. He also testified that, after the goods were shipped without his permission, he personally visited the office of the Aramco president and left a long and detailed message, including pur-

chase order number, stating his claim to the goods, demanding their immediate return, and threatening legal action if they were not returned. Nevertheless, this evidence does not support the additional requirements that Redland had the sole right to possession of the goods and that Aramco knew of that right but proceeded to deliberately commit a wrongful act. Whether void or valid, the bankruptcy provision played a role in convincing Blas–Kote, and perhaps Aramco, that ISP had the superior claim to the goods. More importantly, the custom of dealing between Redland and ISP was to pay when invoiced after delivery, not before. Therefore, any evidence that Aramco knew that Redland had not been paid is irrelevant because it was the customary business practice of this buyer and seller. We find no evidence of conversion on the part of Aramco. Aramco's first point of error is sustained.

By their eleventh and fourth points of error respectively, Bechtel and Aramco contend that the trial court erred in failing to disregard the jury's answer to special issue three, finding that both companies tortiously interfered with Redland's contract with Blas–Kote. Each appellant asserts that there is no evidence that it interfered with a contract between these parties. Again we agree. To recover on a cause of action for tortious interference, one must establish that the defendant maliciously interfered with the contractual relationship and did so without legal justification or excuse. *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105, 107 (Tex.1984).

■ There is evidence to establish that Mr. Wayne Christian, a Bechtel employee, and two unidentified employees of Aramco were present in the Blas–Kote yard at the time Mr. Coon angrily stopped the crating and shipping of the water screens. Mr. Coon testified that all present overheard Mr. Stollenwerk's statement to Mr. Coon that no one was going to be allowed to steal Redland's goods. Testimony of the conversation between Mr. Stollenwerk and Mr. Coon constitutes some evidence that Bechtel knew of the oral agreement between the parties that Blas–Kote would not

release the goods without Mr. Coon's permission. However, there is no evidence of an intentional or willful act of interference with their contract. Aramco merely accepted the goods, whose delivery was already behind schedule. Redland's position is that had Bechtel not inspected the goods, the goods would have been worthless to ISP and thus it would not have tried to induce Blas–Kote to ship them without Redland's permission. As previously stated, the act of inspecting and technically releasing the goods was a necessary act, anticipated by all parties. Bechtel's responsibilities to Aramco were well known to all concerned. There is nothing in the record to suggest that this final inspection was conducted maliciously, without just cause or excuse or with the intent to injure Redland. Bechtel's acts were to have taken place regardless of the time of ISP's payment to its subcontractor, Redland. We find no evidence that any acts of Bechtel or Aramco induced Blas–Kote to breach its agreement with Redland. The undisputed evidence shows that the September 22, 1980, letter from ISP to Blas–Kote was the sole basis upon which Blas–Kote released the goods for shipment. Bechtel's eleventh and Aramco's fourth points of error are sustained.

■ Bechtel contends in its thirteenth and fifteen points of error that the trial court erred in failing to disregard the jury's findings that Bechtel conspired to convert the goods and conspired to tortiously interfere with its contract with Blas–Kote. Aramco raises similar complaints in its eighth and tenth points of error. Bechtel asserts that there is no evidence that Bechtel entered into any agreement to exercise dominion over, or to obtain possession of, the goods in denial of any claim of title by Redland. Both appellants argue that there is no evidence that Bechtel entered an agreement with any party to induce Blas–Kote to breach its contract with Redland.

A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v.*

*Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983); *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854 (Tex.1968). It requires that one have knowledge of the object and purpose of the conspiracy; one without knowledge of the scheme to injure another by the commission of a particular wrong cannot share the intent to injure. *Schlumberger Well Surveying Corp.*, 435 S.W.2d at 857.

Redland alleged that the decision to waive the certification papers was part of a conspiracy to obtain possession of the goods without the necessity of paying Redland. Under Redland's theory, the waiver became necessary after Redland announced to all parties that it would not deliver the certification papers until it was paid for the goods. Redland also claims that Bechtel's inspection and release of the goods was further evidence of a conspiracy. Such circumstantial evidence does not meet the strong showing of a common purpose required before imposing liability for conspiracy. Vital facts may not be proved by unreasonable inferences from other facts and circumstances, neither can an actionable conspiracy be established by piling inference upon inference. *Schlumberger Well Surveying Corp.*, 435 S.W.2d at 858. The evidence establishes that the letter from ISP was the sole inducement for Blas–Kote to release the goods. There is no evidence that either Bechtel or Aramco knew of the letter or knew that ISP was going to renege on its obligation to pay Redland. On the contrary, Bechtel had been present when ISP assured Redland that it would be paid. ISP later notified Redland's lender that it would pay Redland the contract price plus negotiated revision costs. Furthermore, Bechtel had the privilege to waive the provision of its contract with ISP regarding the requirement of certification papers, without incurring liability to Redland. The decision was made several days prior to the confrontation in the Blas–Kote yard. Under the circumstances, the certification papers were of little consequence and constituted one more possible delay in shipping the already overdue goods. Finally, as previously discussed, the inspection and release was a pre-requisite to Aramco's acceptance of the goods. Moreover, Bechtel had no agreement with Redland not to inspect before ISP paid Redland.

We find no evidence of conspiracy to convert goods or conspiracy to tortiously interfere with contractual relationships. Bechtel's points of error thirteen and fifteen and Aramco's points of error eight and ten are sustained.

Our findings with regard to these points of error are dispositive of this appeal and Redland's cross appeal regarding damages. When there is no finding of liability the issue of damages is immaterial. *Southern Pine Lumber Co. v. Andrade*, 132 Tex. 372, 124 S.W.2d 334, 335 (1939). All points of error in Redland's appeal are overruled. The judgment of the trial court against Bechtel and Aramco is reversed and rendered.